# SULLIVAN ET AL. *v.* LITTLE HUNTING PARK, INC., ET AL.

No. 33.   Argued October 13, 1969—Decided December 15, 1969

See: 209 Va. 279, 163 S. E. 2d 588.

*Allison W. Brown, Jr.,* argued the cause for petitioners. With him on the briefs were *Peter Ames Eveleth, Robert M. Alexander, Jack Greenberg,* and *James M. Nabrit III.*

*John Charles Harris* argued the cause and filed a brief for respondents.

Briefs of *amici curiae* urging reversal were filed by *Solicitor General Griswold, Assistant Attorney General Leonard, Louis F. Claiborne, Peter L. Strauss,* and *Joseph J. Connolly* for the United States, and by *Arnold Forster, Sol Rabkin, Melvin L. Wulf, Edwin J. Lukas, Samuel Rabinove,* and *Paul Hartman* for the Anti-Defamation League of B'nai B'rith et al.

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BLACK.

This case, which involves an alleged discrimination against a Negro family in the use of certain community facilities, has been here before. The Virginia trial court dismissed petitioners' complaints and the Supreme Court of Appeals of Virginia denied the appeals saying that they were not perfected "in the manner provided by law in that opposing counsel was not given reasonable written notice of the time and place of tendering the transcript and a reasonable opportunity to examine the original or a true copy of it" under that court's Rule 5:1, § 3(f).[1]

The case came here and we granted the petition for certiorari and vacated the judgments and remanded the case to the Supreme Court of Appeals for further consideration in light of *Jones* v. *Mayer Co.,* 392 U. S. 409. 392 U. S. 657. On the remand, the Supreme Court of Appeals restated its prior position stating, "We had no jurisdiction in the cases when they were here before, and we have no jurisdiction now. We adhere to our orders refusing the appeals in these cases." 209 Va. 279, 163 S. E. 2d 588. We brought the case here the second time on a petition for certiorari. 394 U. S. 942.

---

[1] Rule 5:1 which is entitled "The Record on Appeal" states the following in § 3 (f):

"Such a transcript or statement not signed by counsel for all parties becomes part of the record when delivered to the clerk, if it is tendered to the judge within 60 days and signed at the end by him within 70 days after final judgment. It shall be forthwith delivered to the clerk who shall certify on it the date he receives it. Counsel tendering the transcript or statement shall give opposing counsel reasonable written notice of the time and place of tendering it and a reasonable opportunity to examine the original or a true copy of it. The signature of the judge, without more, will be deemed to be his certification that counsel had the required notice and opportunity, and that the transcript or statement is authentic. He shall note on it the date it was tendered to him and the date it was signed by him."

## I

When the case was first here respondents opposed the petition, claiming that Rule 5:1, § 3 (f), was not complied with. Petitioners filed a reply brief addressing themselves to that question. Thus the point now tendered was fully exposed when the case was here before, though we ruled on it *sub silentio.*

In this case counsel for petitioners on June 9, 1967, gave oral notice to counsel for respondents that he was submitting the transcripts to the trial judge. He wrote counsel for respondents on the same day to the same effect, saying he was submitting the transcripts to the trial judge that day, filing motions to correct them, and asking the trial court to defer signing them for a ten-day period to allow counsel for respondents time to consent to the motions or have them otherwise disposed of by the court. The judge, being absent from his chambers on June 9, ruled that he had not received the transcripts until June 12. The motions to correct came on for a hearing June 16, at which time the judge ruled that he would not act on the motions until counsel for respondents had agreed or disagreed with the changes requested. After examining the transcripts between June 16 and June 19, counsel for respondents told counsel for petitioners that he had no objections to the corrections or to entry of orders granting the motions to correct. Counsel for respondents then signed the proposed orders which counsel for petitioners had prepared. The proposed orders were submitted to the trial judge on June 20; and on the same day he signed the transcripts, after they had been corrected.

As we read its cases, the Supreme Court of Appeals stated the controlling principle in the following language:

"The requirement that opposing counsel have a reasonable opportunity to examine the transcript sets out the purpose of reasonable notice. If, after

receipt of notice, opposing counsel be afforded reasonable opportunity to examine the transcript, and to make objections thereto, if any he has, before it is signed by the trial judge, the object of reasonable notice will have been attained." *Bacigalupo* v. *Fleming,* 199 Va. 827, 835, 102 S. E. 2d 321, 326.

In that case opposing counsel had seven days to examine the record and make any objections. In the present case he had three days. But so far as the record shows he did not at the time complain that he was not given that "reasonable opportunity" he needed to examine and correct the transcripts.

Petitioners' counsel does not urge—nor do we suggest—that the Virginia Supreme Court of Appeals has fashioned a novel procedural requirement for the first time in this case; cf. *NAACP* v. *Alabama,* 357 U. S. 449, 457–458; past decisions of the state court refute any such notion. See *Bacigalupo* v. *Fleming, supra; Bolin* v. *Laderberg,* 207 Va. 795, 153 S. E. 2d 251; *Cook* v. *Virginia Holsum Bakeries,* 207 Va. 815, 153 S. E. 2d 209.[2] But those same decisions do not enable us

---

[2] In *Bolin* v. *Laderberg,* 207 Va. 795, 153 S. E. 2d 251, appellants' counsel had delivered the transcript to appellees' counsel on November 24, 1965. The transcript was tendered to the trial judge on November 26, and was signed by him on December 3. Appellees moved to dismiss the appeal on the ground that they had not been given "reasonable notice and opportunity" under Rule 5:1. The court stated that the motion should be overruled on the ground that Rule 5:1 provides that "[t]he signature of the judge, without more, will be deemed to be his certification that counsel had the required notice and opportunity, and that the transcript . . . is authentic." The court noted that the judge's "signature appears on the transcript *without more* and is, therefore, his certification that counsel for [appellees] had the required notice of tendering the transcript and the required opportunity to examine it." *Id.,* at 797, 153 S. E. 2d, at 253.

In *Cook* v. *Virginia Holsum Bakeries,* 207 Va. 815, 153 S. E. 2d 209, notice that the transcript would be tendered to the trial judge on

to say that the Virginia court has so consistently applied its notice requirement as to amount to a self-denial of the *power* to entertain the federal claim here presented if the Supreme Court of Appeals desires to do so. See *Henry* v. *Mississippi,* 379 U. S. 443, 455–457 (BLACK, J., dissenting). Such a rule, more properly deemed discretionary than jurisdictional, does not bar review here by certiorari.

## II

Little Hunting Park, Inc., is a Virginia nonstock corporation organized to operate a community park and playground facilities for the benefit of residents in an area of Fairfax County, Virginia. A membership share entitles all persons in the immediate family of the shareholder to use the corporation's recreation facilities. Under the bylaws a person owning a membership share is entitled when he rents his home to assign the share to his tenant, subject to approval of the board of directors. Paul E. Sullivan and his family owned a house

October 20, 1965, was given to counsel for the appellee on October 15. Appellant's counsel, however, did not obtain a copy of the transcript until October 19. At a conference held on that same date, counsel for both parties went over the transcript and agreed on certain corrections and additions. At the hearing on October 20, appellee's counsel claimed he had not been given the reasonable notice and opportunity required by Rule 5:1. He then suggested numerous changes, and the trial judge ordered the transcript altered to reflect those changes. The revised transcript was tendered to the trial judge the next day, October 21, and signed by him that same day. On appeal, appellee moved to dismiss on the ground that the Rule 5:1 requirements had not been satisfied. The Virginia Supreme Court of Appeals overruled the motion, stating: "The narrative was amended to meet the suggested changes of counsel for [appellee], and he conceded in oral argument before us that the statement signed by the trial judge was correct." *Id.,* at 817, 153 S. E. 2d, at 210.

in this area and lived in it. Later he bought another house in the area and leased the first one to T. R. Freeman, Jr., an employee of the U. S. Department of Agriculture; and assigned his membership share to Freeman. The board refused to approve the assignment because Freeman was a Negro. Sullivan protested that action and was notified that he would be expelled from the corporation by the board. A hearing was accorded him and he was expelled, the board tendering him cash for his two shares.

Sullivan and Freeman sued under 42 U. S. C. §§ 1981, 1982 for injunctions and monetary damages. Since Freeman no longer resides in the area served by Little Hunting Park, Inc., his claim is limited solely to damages.

The trial court denied relief to each petitioner. We reverse those judgments.

In *Jones* v. *Mayer Co.,* 392 U. S. 409, we reviewed at length the legislative history of 42 U. S. C. § 1982.[3] We concluded that it reaches beyond state action and operates upon the unofficial acts of private individuals and that it is authorized by the Enabling Clause of the Thirteenth Amendment. We said:

> "Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom— freedom to 'go and come at pleasure' and to 'buy and sell when they please'—would be left with 'a mere paper guarantee' if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands

---

[3] 42 U. S. C. § 1982 provides:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

of a white man. At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep." 392 U. S., at 443.

The Virginia trial court rested on its conclusion that Little Hunting Park was a private social club. But we find nothing of the kind on this record. There was no plan or purpose of exclusiveness. It is open to every white person within the geographic area, there being no selective element other than race. See *Daniel* v. *Paul,* 395 U. S. 298, 301–302. What we have here is a device functionally comparable to a racially restrictive covenant, the judicial enforcement of which was struck down in *Shelley* v. *Kraemer,* 334 U. S. 1, by reason of the Fourteenth Amendment.

In *Jones* v. *Mayer Co.,* the complaint charged a refusal to sell petitioner a home because he was black. In the instant case the interest conveyed was a leasehold of realty coupled with a membership share in a nonprofit company organized to offer recreational facilities to owners and lessees of real property in that residential area. It is not material whether the membership share be considered realty or personal property, as § 1982 covers both. Section 1982 covers the right "to inherit, purchase, lease, sell, hold, and convey real and personal property." There is a suggestion that transfer on the books of the corporation of Freeman's share is not covered by any of those verbs. The suggestion is without merit. There has never been any doubt but that Freeman paid part of his $129 monthly rental for the

assignment of the membership share in Little Hunting Park. The transaction clearly fell within the "lease." The right to "lease" is protected by § 1982 against the actions of third parties, as well as against the actions of the immediate lessor. Respondents' actions in refusing to approve the assignment of the membership share in this case was clearly an interference with Freeman's right to "lease." A narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866, 14 Stat. 27, from which § 1982 was derived. See 392 U. S., at 422–437.

We turn to Sullivan's expulsion for the advocacy of Freeman's cause. If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property. That is why we said in *Barrows* v. *Jackson,* 346 U. S. 249, 259, that the white owner is at times "the only effective adversary" of the unlawful restrictive covenant. Under the terms of our decision in *Barrows,* there can be no question but that Sullivan has standing to maintain this action.

We noted in *Jones* v. *Mayer Co.,* that the Fair Housing Title of the Civil Rights Act of 1968, 82 Stat. 81, in no way impaired the sanction of § 1982. 392 U. S., at 413–417. What we said there is adequate to dispose of the suggestion that the public accommodations provision of the Civil Rights Act of 1964, 78 Stat. 243, in some way supersedes the provisions of the 1866 Act. For the hierarchy of administrative machinery provided by the 1964 Act is not at war with survival of the principles embodied in § 1982. There is, moreover, a saving clause in the 1964 Act as respects "any

right based on any other Federal . . . law not inconsistent" with that Act.[4]

Section 1982 derived from the 1866 Act is plainly "not inconsistent" with the 1964 Act, which has been construed as not "pre-empting every other mode of protecting a federal 'right' or as granting immunity" to those who had long been subject to federal law. *United States* v. *Johnson,* 390 U. S. 563, 566.

We held in *Jones* v. *Mayer Co.* that although § 1982 is couched in declaratory terms and provides no explicit method of enforcement, a federal court has power to fashion an effective equitable remedy. 392 U. S., at 414, n. 13. That federal remedy for the protection of a federal right is available in the state court, if that court is empowered to grant injunctive relief generally, as is the Virginia court. Va. Code Ann. § 8–610 (1957 Repl. Vol.).

Finally, as to damages, Congress, by 28 U. S. C. § 1343 (4), created federal jurisdiction for "damages or . . . equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ." We reserved in *Jones* v. *Mayer Co.,* 392 U. S., at 414–415, n. 14, the question of what damages, if any, might be appropriately recovered for a violation of § 1982.

We had a like problem in *Bell* v. *Hood,* 327 U. S. 678, where suit was brought against federal officers for alleged

---

[4] Section 207 (b) of the Act of July 2, 1964, 78 Stat. 246, provides:

"The remedies provided in this title shall be the exclusive means of enforcing the rights based on this title, but nothing in this title shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law not inconsistent with this title, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right."

violations of the Fourth and Fifth Amendments. The federal statute did not in terms at least provide any remedy. We said:

"[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.*, at 684.

The existence of a statutory right implies the existence of all necessary and appropriate remedies. See *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548, 569–570. As stated in *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 39:

"A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied . . . ."

Compensatory damages for deprivation of a federal right are governed by federal standards, as provided by Congress in 42 U. S. C. § 1988, which states:

"The jurisdiction in civil . . . matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary

to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . ."

This means, as we read § 1988, that both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes. Cf. *Brazier* v. *Cherry*, 293 F. 2d 401. The rule of damages, whether drawn from federal or state sources, is a federal rule responsive to the need whenever a federal right is impaired. We do not explore the problem further, as the issue of damages was not litigated below.

It is suggested, not by any party, but by the dissent, that any relief should await proceedings under the fair housing provisions of Title VIII of the Civil Rights Act of 1968. 82 Stat. 81, 42 U. S. C. § 3601 *et seq.* (1964 ed., Supp. IV). But petitioners' suits were commenced on March 16, 1966, two years before that Act was passed. It would be irresponsible judicial administration to dismiss a suit because of an intervening Act [5] which has no possible application to events long preceding its enactment.

*Reversed.*

---

[5] The Act is not fully effective until December 31, 1969. 42 U. S. C. § 3603 (b) (1964 ed., Supp. IV). Even at that time it will not apply to a "single-family house" if the house is sold without the services of a real estate broker and without the notice described in § 3604 (c) (1964 ed., Supp. IV). See § 3603 (b) (1964 ed., Supp. IV). So no one knows whether the new Act would apply to these ancient transactions, even if they arose after December 31, 1969.

MR. JUSTICE HARLAN, with whom THE CHIEF JUSTICE and MR. JUSTICE WHITE join, dissenting.

In *Jones* v. *Mayer Co.,* 392 U. S. 409 (1968), the Court decided that a little-used section of a 100-year-old statute prohibited private racial discrimination in the sale of real property. This construction of a very old statute, in no way required by its language,[1] and open to serious question in light of the statute's legislative history,[2] seemed to me unnecessary and unwise because of the recently passed, but then not yet fully effective, Fair Housing Title of the Civil Rights Act of 1968 (hereafter Fair Housing Law).[3] Today, the Court goes yet beyond *Jones* (1) by implying a private right to damages for violations of 42 U. S. C. § 1982; (2) by interpreting § 1982 to prohibit a community recreation association from withholding, on the basis of race, approval of an assignment of a membership that was transferred incident to a lease of real property; and (3) by deciding that a white person who is expelled from a recreation association "for the advocacy of [a Negro's] cause" has "standing" to maintain an action for relief under § 1982.

Because the Fair Housing Law will become fully effective less than three weeks from now,[4] I think the majority even more unwise than it was in *Jones,* in precipitately breathing still more life into § 1982, which is both vague and open-ended, when Congress has pro-

---

[1] 392 U. S., at 452–454 (dissenting opinion).

[2] 392 U. S., at 454–473 (dissenting opinion). See Casper, Jones v. Mayer: Clio, Bemused and Confused Muse, 1968 Sup. Ct. Rev. 89, 99–122; The Supreme Court, 1967 Term, 82 Harv. L. Rev. 63, 93–103 (1968).

[3] Civil Rights Act of 1968, Tit. VIII, 42 U. S. C. § 3601 *et seq.* (1964 ed., Supp. IV).

[4] The third and final stage in the expansion of the coverage of the Fair Housing Law takes effect after December 31, 1969. See 42 U. S. C. § 3603 (b) (1964 ed., Supp. IV).

vided this modern statute, containing various detailed remedial provisions aimed at eliminating racial discrimination in housing. For this reason, which I elaborate in Part II, I would dismiss the writ in this case as improvidently granted. To provide examples of some of the difficulties the Court will inevitably encounter if it continues to employ § 1982 in these sorts of cases, I examine in Part III the undiscriminating manner in which the majority deals with, and for the most part ignores, the complexities involved in (1) giving Sullivan relief and (2) engrafting a damage remedy onto § 1982 in a case arising from a state court. But, first, I consider the threshold question of whether there is present in this case an adequate state ground which would bar review by this Court.

I

ADEQUACY OF THE STATE GROUND

The Virginia Supreme Court of Appeals, both before and after this Court's earlier remand, refused to consider the federal questions presented to it because it found that petitioners had failed to give opposing counsel "reasonable written notice of the time and place of tendering the transcript and a reasonable opportunity to examine the original or a true copy of it," in violation of Rule 5:1, § 3 (f), of the local rules of court.[5] The majority here suggests that the State's procedural requirement, though not a "novel" one "fashioned . . . for the first time in this case," nevertheless had not been "so consistently applied . . . as to amount to a self-denial of the *power* to entertain the federal claim." The majority then goes on to conclude that because the State's procedural rule is "more properly deemed discretionary than jurisdictional," review should not be barred here.

---

[5] See n. 1 of the majority opinion, *ante,* at 231, for the text of the rule.

I agree with the majority's conclusion that there is no adequate state ground shown, but I find myself unable to subscribe to the majority's reasoning, which appears to me unclear and confusing.

I am not certain what the majority means in its apparent distinction between rules that it deems "discretionary" and those that it deems "jurisdictional." Perhaps the majority wishes to suggest that the dismissals of petitioners' writs of error by the Supreme Court of Appeals were simply *ad hoc* discretionary refusals to accept plenary review of the lower court's decisions, analogous to this Court's denial of certiorari. If this were all the Virginia Supreme Court of Appeals had done, review of a federal question properly raised below would of course not be barred here. The mere discretionary refusal of the highest state court to grant review of a lower court decision does not provide an adequate state ground. In such circumstances, the decision of the lower court, rather than the order of the highest court refusing review, becomes the judgment. of the "highest court of a State in which a decision could be had" for purposes of 28 U. S. C. § 1257, our jurisdictional statute.[6]

But this case clearly does not present this kind of discretionary refusal of a state appellate court to accept review. Although the Virginia Supreme Court of Appeals may well have the "discretion" to refuse review [7] in a particular case without giving reasons or reconciling its refusal with earlier decisions, the dismissal below was not simply an *ad hoc* exercise of the power not to review every case presented. Instead the state court dismissed the petitions for review for a stated reason, namely, a

---

[6] See, *e. g.*, *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, 347 U. S. 157, 159–160 (1954).

[7] It appears that plenary review by the Virginia Supreme Court of Appeals is not a matter of right for many kinds of cases. See Va. Code Ann. § 8–462 (1957 Repl. Vol.); Va. Const. §§ 87, 88.

lack of "jurisdiction to entertain the appeals because of the failure of counsel for the Sullivans and the Freemans to meet the requirements of Rule 5:1, § 3 (f)." When a state appellate court's refusal to consider the merits of a case is based on the failure to conform to a state rule of practice, review by this Court is barred unless this Court is able to find that application of the state rule of practice to the case at hand does not constitute an adequate state ground. This is so quite irrespective of whether the state appellate court had the power to refuse review for no reason at all.[8]

The majority might have another meaning in mind when it describes the State's procedural rule as "discretionary." It may be suggesting that "reasonable written notice," and "reasonable opportunity to examine" are such flexible standards that the Virginia Supreme Court of Appeals has the "discretion" to decide a close case either of two ways without creating an obvious conflict with earlier decisions. If this is what the majority means by "discretionary rule," then I must register my disagreement. This kind of "discretion" is nothing more than "the judicial formulation of law," for a court has an obligation to be reasonably consistent and "to explain the decision, including the reason for according different treatment to the instant case."[9] Surely a state ground

---

[8] See *Hammerstein* v. *Superior Court*, 341 U. S. 491, 492 (1951); *Chesapeake & Ohio R. Co.* v. *McDonald*, 214 U. S. 191 (1909); *Newman* v. *Gates*, 204 U. S. 89 (1907).

[9] Sandalow, Henry v. Mississippi and the Adequate State Ground: Proposals for a Revised Doctrine, 1965 Sup. Ct. Rev. 187, 226. See *id.*, at 225–226 for a discussion of MR. JUSTICE BLACK's dissent in *Henry* v. *Mississippi*, 379 U. S. 443, 455–457 (1965), which is cited by the majority. *Williams* v. *Georgia*, 349 U. S. 375 (1955), which is not cited by the majority, does not in my view support the reasoning of the majority. I think the result in *Williams* rests upon a determination of inconsistency in the application of the State's procedural requirements for a new trial. See 349 U. S., at 383.

is no less adequate simply because it involves a standard that requires a judgment of what is reasonable, and because the result may turn on a close analysis of the facts of a particular case in light of competing policy considerations.

Although the majority's loose use of the word "discretionary" may suggest that any decision made pursuant to a broad standard cannot provide an adequate state ground, I think examination of the earlier opinions of the Virginia Supreme Court of Appeals, several of which are cited by the majority, provides the proper foundation for the result reached by the majority, under the principle of *NAACP* v. *Alabama,* 357 U. S. 449 (1958).

The finding of the Virginia Supreme Court of Appeals of a violation of Rule 5:1, § 3 (f), in this case was in my view based on a standard of reasonableness much stricter than that which could have been fairly extracted from the earlier Virginia cases applying the rule [10] and its predecessor statute.[11] In other words, although Rule 5:1, § 3 (f), itself may not be novel, the standard implicitly governing the rule's application to the facts here was. I think it fair to conclude that in light of these earlier decisions, and the principle set forth in *Bacigalupo* v. *Fleming,* 199 Va. 827, 835, 102 S. E. 2d 321, 326 (1958),[12] the petitioners here might have justifiably

---

[10] *Bolin* v. *Laderberg,* 207 Va. 795, 153 S. E. 2d 251 (1967); *Cook* v. *Virginia Holsum Bakeries,* 207 Va. 815, 153 S. E. 2d 209 (1967); *Taylor* v. *Wood,* 201 Va. 615, 112 S. E. 2d 907 (1960); *Bacigalupo* v. *Fleming,* 199 Va. 827, 102 S. E. 2d 321 (1958).

[11] *Stokely* v. *Owens,* 189 Va. 248, 52 S. E. 2d 164 (1949); *Grimes* v. *Crouch,* 175 Va. 126, 7 S. E. 2d 115 (1940).

[12] It can be seen from the passage quoted by the majority, see *ante,* at 232–233, that *Bacigalupo* interpreted the rule as requiring that (1) opposing counsel must have a reasonable opportunity to examine the transcript *after* he receives notice; and (2) based on this examination, opposing counsel must have a reasonable opportunity to make any objections he has to the accuracy of

thought that review in the Supreme Court of Appeals would not be barred by the rule, notwithstanding *Snead* v. *Commonwealth,* 200 Va. 850, 108 S. E. 2d 399 (1959), the one case cited below by the Virginia court, relied on here by respondent and yet somehow ignored by the majority.[13]  Because "[n]ovelty in procedural re-

the transcript *before* the transcript is signed by the trial judge. In this case, opposing counsel received notice by telephone on Friday, June 9, and by letter the following Monday.  His opportunity to examine the transcript consisted of the time between Monday and Friday when the transcript was available to him in the judge's chambers; and the time between Friday, June 16, and Monday, the 19th, when he actually had in his possession a copy of the transcript.  Any argument that this length of time, *per se,* is not reasonable opportunity is belied by *Cook* v. *Virginia Holsum Bakeries, supra,* where opposing counsel received a copy of a narrative only two days before the trial judge signed it, and the Virginia Supreme Court of Appeals found no violation of the rule.

[13] In *Snead,* the Virginia Supreme Court of Appeals said:

"It is important that time be given opposing counsel for a reasonable opportunity to analyze such statements characterized by defendant's counsel as being confusing.  The entire testimony of a very material witness was left out of the narrative statement when it was presented to the trial judge and it was necessary for him to insert it.  We are of the opinion that the notice delivered to the Commonwealth's Attorney at his residence, after office hours, thirty minutes before tendering a narrative statement of the evidence to the trial judge for his signature, does not constitute reasonable notice within the plain meaning of Rule 5:1, § 3 (f) and that the terms of the Rule are mandatory and jurisdictional."  200 Va., at 854, 108 S. E. 2d, at 402.

This case is far different from *Snead* in significant respects.  First, in *Snead* the court was not confronted with a transcript but instead with a narrative; and this narrative was, by the admission of appellant's own counsel, "of a confusing nature and character." In this case, on the other hand, the record fails to show that counsel for respondent made any objection to the trial judge as to the adequacy of the notice, or to the accuracy of the transcript, see *Taylor* v. *Wood, supra; Stokely* v. *Owens, supra.*  Furthermore, at oral argument before this Court, counsel for respondent could not point to a single inaccuracy in the transcript as signed by the

quirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal . . . rights," *NAACP* v. *Alabama,* 357 U. S., at 457–458, I conclude that the decision below does not rest on an adequate state ground.

## II

Because Congress has now provided a comprehensive scheme for dealing with the kinds of discrimination found in this case, I think it very unwise as a matter of policy for the Court to use § 1982 as a broad delegation of power to develop a common law of forbidden racial discriminations. A comparison of 42 U. S. C. § 1982 with the new Fair Housing Law, and consideration of the Court's task in applying each, demonstrate to me the need for restraint, and the appropriateness of dismissing the writ in this case, now grounded solely on an alleged violation of § 1982.

Petitioners here complain of discrimination in the provision of recreation facilities ancillary to a rented house found in one of the four subdivisions served by Little Hunting Park. On the one hand, the Fair

---

trial judge. Tr. of Oral Arg. 20. Second, in *Snead* opposing counsel was only given one-half hour's notice of a proposed tender to the judge *for signature that night.* In this case, although the transcript was sent to the judge at about the same time as opposing counsel received notice, that notice stated that the judge would not be asked to sign the transcript for a week, so counsel could first have an opportunity to examine it.

Respondent suggests that the rule requires that opposing counsel have notice and an opportunity to examine the transcript before the transcript is given to the judge rather than simply before the judge signs it. No prior Virginia case of which we have been made aware has so stated, however, and the principle of *Bacigalupo* quoted by the majority suggests that the key is that there be an opportunity to inspect and to make objections *before* the judge signs the transcript.

Housing Law has a provision that explicitly makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of . . . rental [of housing], *or in the provisions of services or facilities in connection therewith,* because of race, [or] color . . . ." 42 U. S. C. § 3604 (b) (1964 ed., Supp. IV). (Emphasis added.) In contrast, as the majority in *Jones* noted, § 1982 "does not deal specifically with discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling," 392 U. S., at 413.

By attempting to deal with the problem of discrimination in the provision of recreational facilities under § 1982, the Court is forced, in the context of a very vague statute, to decide what transactions involve "property" for purposes of § 1982. The majority states that "[i]t is not material whether the membership share [in Little Hunting Park] be considered realty or personal property, as § 1982 covers both." But examination of the opinion will show that the majority has failed to explain why the membership share is *either* real *or* personal property for purposes of § 1982. The majority's complete failure to articulate any standards for deciding what is property within the meaning of § 1982 is a fair indication of the great difficulties courts will inevitably confront if § 1982 is used to remedy racial discrimination in housing. And lurking in the background are grave constitutional issues should § 1982 be extended too far into some types of private discrimination.[14]

Not only does § 1982 fail to provide standards as to the types of transactions in which discrimination is unlawful, but it also contains no provisions for enforcement, either public or private. To give its construction of the statute effect, the Court has had to imply reme-

[14] See *Civil Rights Cases,* 109 U. S. 3 (1883).

dies that Congress has not explicitly provided—injunctive relief in *Jones,* and now a right to damages here. See Part III, *infra.*

These remedies are expressly provided for in the Fair Housing Law, which, with its variety of techniques for enforcing its prohibition of housing discrimination, again stands in sharp contrast with § 1982. First, an injured party can complain to the Secretary of Housing and Urban Development who is empowered to investigate complaints, and use "informal methods of conference, conciliation, and persuasion" to secure compliance with the law.[15] Should the Secretary's efforts prove unavailing, the complainant can go to court.[16] As an alternative to going first to HUD, it appears that a person may go directly to court to enforce his rights under the Fair Housing Law,[17] which expressly provides for a wide variety of relief, including restraining orders, injunctions, compensatory damages, and punitive damages up to $1,000.[18] Furthermore, the Act allows a court to appoint counsel and waive all fees for indigent plaintiffs, and to award costs and, in certain cases, counsel fees to a successful plaintiff.[19] In addition to actions initiated by private parties, the Attorney General is empowered to bring civil actions for preventive civil relief, and criminal actions to punish those who by force or threat of force willfully interfere with or intimidate

---

[15] 42 U. S. C. § 3610 (a) (1964 ed., Supp. IV).

[16] *Id.,* § 3610 (d).

[17] *Id.,* § 3612. See Fair Housing Law and Other Federal Civil Rights Laws and Executive Orders Relating to the Programs of the U. S. Department of Housing and Urban Development, Dept. of Housing and Urban Development, Office of Equal Opportunity; Note, Discrimination in Employment and in Housing: Private Enforcement Provisions of the Civil Rights Acts of 1964 and 1968, 82 Harv. L. Rev. 834, 839, 855–859, 862–863 (1969).

[18] 42 U. S. C. § 3612 (c) (1964 ed., Supp. IV).

[19] *Id.,* §§ 3612 (b), 3612 (c).

those who wish to exercise, or aid others in the exercise, of their rights under the Fair Housing Law.[20]

Given this comprehensive, contemporary statute, the limitations of which have not yet even been established, I believe that the Court should not decide this case but should instead dismiss the writ of certiorari as improvidently granted.[21] This Court's certiorari jurisdiction should not be exercised simply "for the benefit of the particular litigants," *Rice* v. *Sioux City Cemetery*, 349 U. S. 70, 74 (1955), but instead for the "settlement of [issues] of importance to the public as distinguished from . . . the parties," *Layne & Bowler Corp.* v. *Western Well Works, Inc.*, 261 U. S. 387, 393 (1923). Even from the perspective of the parties, this case has lost much of its practical importance due to the fact that Dr. Freeman's work has taken him and his family away from the area served by Little Hunting Park, thereby making moot his original claim for injunctive relief.[22] But more fundamentally, I think here, as I did in *Jones*, that the existence of the Fair Housing Law renders the decision of this case of little "importance to the public." For, although the 1968 Act does not cover this particular case,[23] should a Negro in the future rent a house but be

---

[20] *Id.*, §§ 3613, 3631. See *id.*, § 3617.

[21] Cf. Bickel, Foreword: The Passive Virtues, The Supreme Court, 1960 Term, 75 Harv. L. Rev. 40 (1961).

[22] Given that the market price of a membership share in Little Hunting Park apparently ranged from $150 to $230 during the time in question, see Government's *Amicus* Brief 5, Freeman's compensatory damages will not, in all probability, be substantial. And, as I point out in the next section, unresolved factual issues may bar any relief at all for Sullivan.

[23] The relevant events in this case all took place in 1965, long before the Fair Housing Law first went into effect on April 11, 1968. Whether the Fair Housing Law would protect Dr. Freeman were like events to take place again after December 31, 1969, in

denied access to ancillary recreational facilities on account of race, he could in all likelihood secure relief under the provisions of the Fair Housing Law.[24]

## III

The undiscriminating manner in which the Court has dealt with this case is both highlighted and compounded by the Court's failure to face, let alone resolve, two issues that lie buried beneath the surface of its opinion. Both issues are difficult ones, and the fact that the majority has not come to grips with them serves to illustrate the inevitable difficulties the Court will encounter if it continues to employ § 1982 as a means for dealing with the many subtle human problems that are bound to arise as the goal of eliminating discriminatory practices in our national life is pursued.

A. RELIEF FOR SULLIVAN

Because the majority opinion is highly elliptical as to (1) the circumstances surrounding Sullivan's expulsion from Little Hunting Park, (2) the relief Sullivan sought in the state court, and (3) the decision of the trial court, it is necessary for me to begin my analysis simply by stating the facts of these aspects of the case. A full

---

part would depend upon whether the transaction between Sullivan and Freeman would fall within any of the categories described in n. 24, *infra.* On the facts as they appear in this record, the exemption found in 42 U. S. C. § 3607 (1964 ed., Supp. IV) would not appear to bar recovery.

[24] In addition to covering all single-family houses not owned by private individuals, and single-family houses owned by a private individual who owns more than three houses, the Fair Housing Law, after December 31, 1969, covers the rental of all single-family homes (a) rented with the help of a real estate broker; or (b) offered for rental through a written notice or advertisement which is discriminatory. See 42 U. S. C. § 3603 (b) (1964 ed., Supp. IV).

examination of the record reveals, first, the necessity for a remand on the majority's own premises. It also makes apparent the majority's failure to provide any guidance as to the legal standards that should govern Sullivan's right to recovery on remand. An awareness of the complexity of the issues relevant to Sullivan's right to redress suggests further, I think, the appropriateness of a discretionary denial of review.

1. *The Circumstances of Sullivan's Expulsion.* After the Board of Little Hunting Park refused to approve the assignment of a membership share from Sullivan to Freeman, Sullivan attempted to convince the Board to reverse its decision. To this end, Sullivan first met with members of the Board, and protested their actions. He subsequently mobilized a campaign both by other members of the club and by persons in the community as a whole to force the Board to reconsider its decision. The means used in this campaign, as the brief for petitioner Sullivan acknowledges,[25] included phone calls to members of the Board, letters to local clergy, and the circulation among the members of Little Hunting Park of a petition that called for a meeting of the full membership to consider Dr. Freeman's case.

On July 8 Sullivan received a letter from the Board which stated that it had determined that there was "due cause" to warrant a hearing in order to determine whether Sullivan should be expelled from Little Hunting Park, pursuant to its bylaws, for "conduct inimicable to the Corporation members." This letter referred to Sullivan's "non-acceptance of the Board's decision on the assignment of your membership to your tenant . . . along with the continued harassment of the board members" as the basis for the Board's "due cause" determination.

---

[25] See Petitioners' Brief 9–11, 39–50.

The Board subsequently provided a detailed specification of its charges against Sullivan,[26] and these included, *inter alia,* allegations that Sullivan had (a) instigated a campaign by which board members were harassed by "unfriendly phone calls" accusing them of bigotry; (b) used "abusive" language in a phone call to the president of the Board; (c) written letters to local clergy, including the minister of the church which employed the president of Little Hunting Park, accusing board members of participation in "real moral evil"; and (d) used "violent and abusive language" to members of Little Hunting Park who had refused to sign his petition. After the hearing on these charges, the Board expelled Sullivan and tendered to him the current market value of the two membership shares that he held.

In response to these actions, Sullivan brought this suit in the Circuit Court of Fairfax County, Virginia, against Little Hunting Park and its Board seeking as relief (1) an order compelling Little Hunting Park to reinstate his membership; (2) monetary damages in the amount of $15,000; and (3) an injunction requiring the Board to approve the assignment to Freeman and forbidding the Board to use race as a factor in considering membership. The trial court, after hearing disputed evidence as to the reasons for Sullivan's expulsion, found for the defendants. It stated that the

[26] See Appendix 181–182, 185–186. The detailed specification of charges against Sullivan was given by Little Hunting Park as part of a settlement of a suit brought by Sullivan to enjoin the hearing on his expulsion. This earlier suit, which was dismissed by agreement between the parties, was brought by Sullivan because of the vagueness of the July 8 letter as to the conduct upon which the due-cause hearing was to be held. The settlement of this earlier suit also included a stipulation between Sullivan and Little Hunting Park as to future lawsuits, which respondents claimed below barred Sullivan's suit before us now. This aspect of the stipulation was noted, but not passed on, by the trial judge below.

scope of its review of the Board's actions was "limited" because Little Hunting Park was a "private and social" club, and then went on to find that the Board had acted within "the powers conferred on it by the By-Laws" in expelling Sullivan, and that "there was ample evidence to justify [the Board's] conclusion that the complainant's acts were inimicable to the Corporation's members and to the Corporation."

2. With this statement of the record in mind, several observations must be made about the majority's treatment of Sullivan's rights. First, in stating that "Sullivan's expulsion [was] for the advocacy of Freeman's cause," the majority surely cannot be taken to have resolved disputed testimony, and decided the facts underlying Sullivan's expulsion. If these facts are relevant to Sullivan's remedial rights, as surely they must be, then a remand for detailed findings seems unavoidable under the majority's own premises.

Second, the majority has not explained what legal standard should determine Sullivan's rights under § 1982. The majority simply states that "Sullivan has standing to maintain this action" under § 1982, without even acknowledging that some standard is essential for this case to be ultimately decided.

One can imagine a variety of standards, each based on different legal conclusions as to the "rights" and "duties" created by § 1982, and each having very different remedial consequences. For example, does § 1982 give Sullivan a right to relief only for injuries resulting from Little Hunting Park's interference with *his* statutory duty to Freeman under § 1982? If so, what is Sullivan's duty to Freeman under § 1982? Unless § 1982 is read to impose a duty on Sullivan to *protest* Freeman's exclusion, he would be entitled to reinstatement under this standard only if the Board had expelled him for the simple act of assigning his share to Freeman.

As an alternative, Sullivan might be thought to be entitled to relief from those injuries that flowed from the Board's violation of *its* "duty" to Freeman under § 1982. Such a standard might suggest that Sullivan is entitled to damages that resulted from Little Hunting Park's initial refusal to accept the assignment to Freeman but again not to reinstatement. Or does the Court think that § 1982 gives Sullivan a right to relief from injuries that result from his "legitimate" protest aimed at convincing the Board to accept Freeman? If so, what protest activities were legitimate here? Most extreme would be a standard that would give Sullivan relief from injuries that were the result of *any* actions he took to protest the Board's initial refusal, irrespective of Sullivan's means of protest. Only this standard would require reinstatement, irrespective of the disputed facts here. But this standard would mean that § 1982 gave Sullivan a right to regain his membership even if the Board has expelled him for using intemperate and abusive threats as a means of protesting Freeman's exclusion.[27]

## B. State Court Remedies for Federal Rights

Because this case arises from a state court, it presents special problems which the majority overlooks, and which suggests again the undesirability of deciding this case in the context of this ancient statute. In deciding that there is a right to recover damages in this case, the majority overlooks the complications involved by dint of the fact that a state court is being asked to provide

---

[27] *Barrows* v. *Jackson,* 346 U. S. 249 (1953), upon which the majority appears to place heavy reliance, gives no guidance as to the extent a state court is obliged to allow a white person to recover affirmatively either damages or other relief after he has transferred a real estate interest to a Negro. In *Barrows* the Court held that damages could not be awarded *against* a white defendant sued for breach of a racially restrictive covenant.

a remedy for a federal right bottomed on a federal statute that itself has no remedial provisions.

Implied remedies for federal rights are sometimes solely a matter of federal law [28] and other times dependent, either wholly or partially, upon state law.[29] Difficult and complex questions are involved in determining what remedies a state court must [30] or must not [31] provide in cases involving federal rights.[32]

It should be noted that the majority's opinion, though perhaps deciding very little [33] only adds to the confusion already existing in this area. Section 1988 of Title 42, which the majority apparently thinks decides this case, is concerned with the remedial powers of *federal district courts* and it provides that the federal courts shall look to state law to find appropriate remedies when the applicable federal civil rights law is "deficient in the provisions necessary to furnish suitable remedies . . . ." But the majority turns this provision on its head by suggesting (1) that § 1988 creates a federal remedy, apart from state law, when the remedial provisions of a civil rights statute, like § 1982, are "deficient"; and (2) that § 1988 itself somehow imposes this federal remedy on the States.

[28] See *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964).

[29] See *Ward* v. *Love County,* 253 U. S. 17 (1920); *The Tungus* v. *Skovgaard,* 358 U. S. 588 (1959).

[30] *Testa* v. *Katt,* 330 U. S. 386 (1947) (state court obligated to give treble damages, required by federal statute, for violation of Emergency Price Control Act).

[31] See *Avco Corp.* v. *Aero Lodge No. 735,* 390 U. S. 557, 560 n. 2 (1968) (Court did not decide whether the remedies available in a state court in a suit to enjoin a strike are limited to the remedies available under federal law).

[32] See H. Hart & H. Wechsler, The Federal Courts and The Federal System 474–477 (1953); Greene, Hybrid State Law in the Federal Courts, 83 Harv. L. Rev. 289, 315–319 (1969).

[33] The majority, in its penultimate paragraph, appears not to decide whether the "rule of damages" is "drawn from federal or state sources."

If § 1988 says anything at all relevant for this case, it suggests that in those cases where it is appropriate to cure remedial deficiencies of a federal civil rights statute by implication, this is to be done by looking to state law to see what remedies, consistent with federal policies, would be available there.

By reason of these considerations, many of which could hardly have been foreseen at the time certiorari was granted, I would dismiss the writ in this case as improvidently granted.