**The CITY OF NEW YORK, Plaintiff,**

v.

**FILLMORE REAL ESTATE, LTD., et al., Defendants.**

**No. 85 CV 1769 (ERK).**

United States District Court, E.D. New York.

July 29, 1987.

As Corrected Sept. 8, 1987.

Frederick A.O. Schwarz, Jr., Corp. Counsel, by James F. Simon, and Sandy A. Roberts, Asst. Corp. Counsel's, New York City, for plaintiff.

Louis C. Pulvermacher, New York City, for Nancy Rondone.

## MEMORANDUM & ORDER

KORMAN, District Judge.

### I. *Procedural Background*

Plaintiff, the City of New York (the "City"), brought this action alleging violations of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* (the "Fair Housing Act"), and the Civil Rights Act of 1866, 42 U.S.C. § 1982, as well as pendent state law claims. Defendant Fillmore Real Estate, Ltd. ("Fillmore"), is a real estate brokerage firm with an office in Brooklyn, New York. Defendant Nancy Rondone ("Rondone") was, during the relevant time period, an employee of Fillmore.

The complaint alleges that defendants engaged in the practice of "steering," a

form of housing discrimination. Steering occurs when a real estate broker directs white potential renters or purchasers to predominantly white neighborhoods and black potential renters or purchasers to predominantly black or integrated neighborhoods.

The City's Commission on Human Rights (the "Commission") investigates real estate brokers suspected of steering by sending white and black "testers" to the broker. Each tester requests to be shown an apartment or home in a certain price range. If the white tester is shown apartments or homes in a white neighborhood and the black tester is not, then this raises an inference of racial discrimination. Following a series of tests of Fillmore, plaintiff commenced this action seeking compensatory and punitive damages as well as declaratory and injunctive relief.

### II. *Rondone's Motion for Summary Judgment*

Rondone has moved to dismiss, or in the alternative, for summary judgment, pursuant to Rules 12(b)(1), 12(b)(6) and 56(b) of the Federal Rules of Civil Procedure. In support of her motion she argues (a) that the City has failed to come forward with evidentiary facts which establish a prima facie case of discriminatory steering, (b) that the City may not assert a claim under 42 U.S.C. § 1982, and (c) that the Fair Housing Act claim is untimely. Rondone has also moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure and to strike plaintiff's demand for punitive damages.

### A. *Prima Facie Case*

■ Plaintiff's evidence, if credited by the trier of fact, would establish the following material facts with respect to defendant Rondone: Although the City sent black and white testers to Fillmore on three occasions, Rondone was involved in only one of these tests of Fillmore.[1] On June 26, 1984

---

1. The two other tests of Fillmore took place on June 15 and November 13, 1984. The City alleges that on June 15, 1984 a Fillmore employee showed a white couple a two-family house for

sale in the Canarsie section of Brooklyn, a predominantly white area. Later that day a black couple requested to see similar homes in Canarsie but was told that the only such home avail-

a white tester employed by the Commission, Robert Tilley ("Tilley"), asked to see one bedroom apartments renting for four hundred dollars or less per month in the Canarsie section of Brooklyn (Affidavit of Robert Tilley, sworn to April 6, 1987 ("Tilley Aff.") ¶ 4). Tilley explained that he was unmarried. Rondone made a number of telephone calls, but was not successful in arranging for Tilley to view an apartment. Some of the apartments had been rented, the landlords of other apartments were unwilling to rent to a single male and the telephone calls to other landlords were not answered (Tilley Aff. ¶ 5). Tilley then left.

Tilley returned to Fillmore later that day. Tilley was then taken by Rondone to view an apartment in a private home located at 102–11 Avenue L, Brooklyn. The apartment rented for three hundred and seventy five dollars per month. When they returned to Fillmore's offices, Rondone offered to show Tilley another apartment located at 1138 East 100th Street, Brooklyn. Tilley declined the offer (Tilley Aff. ¶¶ 8–11).

On the same day a black tester, Barry Jamison ("Jamison"), visited Fillmore and told Rondone he was interested in renting a one bedroom apartment for four hundred dollars per month in a two family house (Jamison deposition at p. 25). Rondone informed him that "there [were] problems renting to single males" (*id.* at pp. 25–26). While Rondone made a number of telephone calls, none of these calls resulted in Jamison viewing any apartments.

Jamison testified at this deposition that Rondone "made attempts to contact landlords and a couple were not interested in renting to single males" (*id.* at pp. 33–34). Jamison's report also states that of the three telephone calls Rondone made, two of the landlords "were unwilling to compro-

mise" and rent to single males (Affidavit of Louis C. Pulvermacher, sworn to January 28, 1987, Exh. E). Jamison's report does not state that he was discriminated against because he was black (*id.*).[2]

Rondone argues that Jamison's deposition testimony and report demonstrate that he was not shown any apartments because landlords are reluctant to rent to single males, not because of his race. Even assuming such reluctance, however, Rondone does not explain why the white tester—also a single male—was nonetheless shown one apartment and was offered the opportunity to view another while the black tester was not told of these apartments. Contrary to Rondone's protestations, a reasonable jury could conclude that the explanation for this disparate treatment was Jamison's race. Thus, there is a genuine dispute of material fact preventing summary judgment on this ground.

### B.  *Section 1982*

Rondone asserts that the City may not bring a claim based on racial steering under section 1982. Although not entirely clear, her argument appears to be (1) that the City is not a proper plaintiff under section 1982 and (2) that the City lacks standing to assert such a claim.

### 1.  *Proper Plaintiff*

█ Rondone argues that the City is not a proper plaintiff. Relying on language in a Supreme Court opinion which suggests that section 1982 is "enforceable only by private parties acting on their own initiative," *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 417, 88 S.Ct. 2186, 2191, 20 L.Ed.2d 1189 (1968), defendant asserts that local governmental entities such as plain-

---

able was one in the Flatlands section of Brooklyn, a racially integrated area. On November 13, 1984 an Hispanic couple sought information concerning homes in Canarsie and were told by a Fillmore employee other than Rondone none were available. Later that day a white tester was shown two houses in Canarsie. A Fillmore salesperson called this white tester twice more,

on November 17, 1984 and December 15, 1984, offering to refer the tester to available houses.

**2.** Although the City asserts that further discovery will reveal other, more recent episodes of steering by Rondone, the City has not proferred any evidence that provides a basis for concluding that such other episodes by Rondone in fact occurred.

tiff are precluded from bringing section 1982 actions.

The language in *Jones*, however, simply comes at the conclusion of Part I of the opinion, in which the Supreme court in general terms outlined the reasons why passage of the Fair Housing Title (Title VIII) of the Civil Rights act of 1968 "had no effect on § 1982." 392 U.S. at 416, 88 S.Ct. at 2191. While the Supreme Court observed that, in contrast to the Fair Housing Title, section 1982 "does not empower a federal administrative agency to assist aggrieved parties," 396 U.S. at 414, 88 S.Ct. at 2189 (footnote omitted), and "makes no provision for intervention by the Attorney General," *id.* (footnote omitted), the Supreme Court simply did not address or decide the issue of whether a local governmental agency could be an "aggrieved party" under section 1982.[3] Thus, the language in *Jones* at most supports the proposition that section 1982 did not expressly provide for federal or local governmental authorities to sue in a *parens patrias* role.[4]

Implicitly recognizing the weakness of her argument, defendant insists on characterizing this action as one brought by the City in its *parens patriae* role (Rondone's Moving Memo. at p. 7; Rondone's Reply Memo. at pp. 16–17). While the City has brought this action on behalf of its citizens, it also brings this action on its own behalf, asserting that defendants' discriminatory practices depress real estate values, thereby decreasing the City's tax revenues (Amended Complaint ¶ 18).

Support for the City's right to sue for this alleged injury may be found in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S.

229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). The Supreme Court held there that an action under section 1982 may be brought by a caucasian who suffered economic injury "for trying to vindicate the rights of minorities protected by § 1982." 396 U.S. at 237, 90 S.Ct. at 404. Specifically, the Supreme Court concluded that to allow such injury to go unaddressed "would give impetus to the perpetuation of racial discrimination." *Id.* Relying on *Barrows v. Jackson*, 346 U.S. 249, 259, 73 S.Ct. 1031, 1036, 97 L.Ed. 1586 (1953), the Supreme Court concluded that "the white owner is at times 'the only effective adversary of the unlawful restrictive convenant'" and "there can be no question but that [he] has standing to maintain this action" for damages which he suffered. *Id.*

*Sullivan* stands for the proposition that section 1982 is not limited to affording a remedy only to blacks or others who are the immediate victims of housing discrimination. While the present case does not involve a white owner who suffered damages as a result of his refusal to abide discriminatory practices, the same compelling considerations justify a cause of action under section 1982. This is particularly so where, given the difficulty of proof and the small sums involved, the City and other local governments injured by such activity may be the only effective challengers to the misconduct alleged in this action.

2. *Standing*

◼ Defendant's arguments with respect to the City's standing are no more persuasive. In *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), a Fair Housing Act case

---

**3.** The Supreme Court has on more than one occasion declined to follow language taken out of context from an opinion to resolve an issue which was not there presented or decided. *Jenkins v. Delaware*, 395 U.S. 213, 216, 89 S.Ct. 1677, 1679, 23 L.Ed.2d 253 (1969). Indeed, the holding in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), that section 1982 proscribes purely private discrimination, rejected dictum in an earlier case that section 1982 was directed only toward "'governmental actions.'" 392 U.S. at 419, 88 S.Ct. at 2192.

**4.** Indeed, it is worth noting that in *Jones* the Supreme Court also observed that section 1982 "contains no provision expressly authorizing a federal court to authorize the payment of damages." 392 U.S. at 415, 88 S.Ct. at 2190. The Supreme Court subsequently held that compensatory damages could nonetheless be awarded in actions brought under section 1982. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

challenging racial steering, the Supreme Court forcefully rejected the position that a municipality lacked standing to challenge racial steering:

> The adverse consequences attendant upon a "changing" neighborhood can be profound. If petitioners' steering practices significantly reduce the total number of buyers in the Bellwood housing market, prices may be deflected downward.... A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services. Other harms flowing from the realities of a racially segregated community are not unlikely. As we have said before, "[t]here can be no question about the importance" to a community of "promoting stable, racially integrated housing." *Linmark Associates, Inc. v. Willingboro Tp.*, 431 U.S. 85, 94, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977). If, as alleged, petitioner's sales practices actually have begun to rob Bellwood of its racial balance and stablility, the village has standing to challenge the legality of that conduct. 441 U.S. at 110–11, 99 S.Ct. at 1613–14 (citations and footnotes omitted).

The City alleges that defendants' "practices contribute to the continued segregation of communities in Brooklyn ... jeopardize the economic and social welfare of the City of New York and its citizens" and "disrupt free trade within the City's housing market, resulting in a diminution in real estate values and a decrease in the City's tax revenues" (Amended Complaint ¶¶ 1, 18). These allegations of injury to the City are sufficient to confer standing.[5] Rondone's motion for summary judgment based on the City's lack of standing is therefore denied.

5. It is unnecessary to address Rondone's argument that the City cannot show that her actions caused specific damage to the City, because the City also seeks declaratory and injunctive relief.

6. Rondone's motion to strike plaintiff's claim for punitive damages is denied. To the extent Rondone's argument is based on the contention

## III. *Conclusion*

 Because the City may maintain this action against Rondone pursuant to section 1982, it is unnecessary to decide whether or not the City's Fair Housing Act claim is timely. Accordingly, Rondone's motions for summary judgment and for sanctions are denied.[6]

that her conduct does not warrant the imposition of punitive damages, that presents a factual issue to be resolved at trial. To the extent her argument asserts that punitive damages are not available under section 1982, her position is erroneous. *See Woods-Drake v. Lundy*, 667 F.2d 1198, 1203 n. 11 (5th Cir.1982).