Allen **CLAIBORNE** et al., on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellees, Cross-Appellants,

v.

**ILLINOIS CENTRAL RAILROAD** et al., Defendants-Appellants, Cross-Appellees.

No. 75–3790.

United States Court of Appeals, Fifth Circuit.

Nov. 2, 1978.

Rehearing and Rehearing En Banc Denied Dec. 18, 1978.

H. Martin Hunley, Jr., Albert H. Hanemann, Jr., New Orleans, La., Martin W. Fingerhut, Asst. Vice-Pres. Ill. Central Gulf R.R., Chicago, Ill., for defendants-appellants, cross-appellees.

Gerard C. Smetana, Chicago, Ill., amicus curiae for Chamber of Commerce of United States.

Steven R. Plotkin, Louis A. Gerdes, Jr., Victor H. Hess, Jr., New Orleans, La., Donald W. Fisher, Toledo, Ohio, for Brotherhood of Railway, etc.

Before RONEY, RUBIN and VANCE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

This appeal concerns principally the method of calculating the compensatory damages due black employees discriminated against by a railroad and whether or not they are due punitive damages. Twenty-eight black employees[1] at Illinois Central Railroad's Mays Yard in Jefferson Parish,

---

1. As to one plaintiff laborer, Tom Mason, no proof was introduced and no damages awarded.

Louisiana filed this action[2] against the railroad and two unions of which they were members, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981, alleging racial discrimination in the operation of the railroad's job classification and promotion system, and in the railroad's furloughing of the plaintiffs in 1969. The trial court upheld all claims against the railroad, and dismissed all claims against the unions. The railroad, conceding that the trial court's findings of discrimination are not clearly erroneous, disputes its calculation of back-pay, its award of punitive damages, and the dismissal of claims against the union. The employees seek only an increase in the amount of attorneys' fees awarded. We affirm the award of compensatory and punitive damages, but remand for recalculation of the amount due each plaintiff. We deny additional attorneys' fees for work in the trial court but remand for an award of fees for this appeal and for subsequent trial court proceedings.

## I. Factual Background

The plaintiffs in this suit are 21 carmen's helpers, also called "oilers," and 7 laborers, who, until November, 1969, were employees of the railroad at Mays Yard. Together with 9 other train yard or "prepare track" employees, the plaintiffs were furloughed in 1969 after a work efficiency study had been undertaken by the railroad's management.[3]

The railroad's long-standing collective bargaining agreements with the union classed employees of the Mays Yard Car Department into four categories: carmen, carmen apprentices, carmen's helpers, and laborers.[4] Carmen were more highly paid than apprentices or helpers, who were, in turn, more highly paid than laborers. The only promotions of right to the carmen's rank accrued to carmen apprentices. Helpers might be upgraded at the discretion of the railroad; no one could be upgraded if qualified apprentices were available for carmen's work.

The plaintiffs' central assertion is that, from 1954 until 1969, the railroad administered its recruiting and promotional system so that in fact all persons classified as carmen were white. This was accomplished by recruiting only white employees to the apprentice class, while all black employees were hired as helpers or laborers; only apprentices and white workers from other classes at Mays Yard were made carmen. The plaintiffs sought to establish the equal or greater qualifications of those black helpers and laborers whom the railroad declined to upgrade, and argued that the railroad had discriminated on the basis of race, in violation of 42 U.S.C. § 2000e–2(a)(1),[5] with respect to the terms and conditions of the plaintiffs' employment.

The trial court upheld the plaintiffs' claims of racial discrimination in an unpublished decision. The court further found that certain of the 1969 furloughs were themselves racially motivated. Although

2. Although denominated a class action in the plaintiffs' original complaint, this suit has not proceeded as a class action, and no class was ever certified.

3. The Mays Yard study was part of a system-wide operational review undertaken for the railroad by Science Management Corporation. The review, the intent of which is not at issue, resulted in changes in work allocation throughout Illinois Central's operation, and was not limited to trainyard workers.

4. The laborers belong to the defendant International Brotherhood of Firemen and Oilers, Helpers, Roundhouse and Railway Shop Laborers. The three other groups belong to the defendant Brotherhood of Railway Carmen of America.

5. 42 U.S.C. § 2000e–2 reads, in part:

(a) . . . It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual or employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

the court concluded that some of the furloughs were not racially premised, it held that these also violated Title VII because the railroad's prior failure to promote the furloughed plaintiffs according to their qualifications deprived them of such job protection as carmen's rank and seniority would have afforded them in a mass lay-off.

Having made findings as to the plaintiffs' qualifications to become carmen, the discriminatory acts of the railroad, and the effects of those acts on the plaintiffs' job status and furloughs, the court awarded damages and other relief as follows:

First, having determined that all the plaintiffs were qualified to become carmen on July 2, 1965, or six months subsequent to their dates of hire, whichever came later, the court awarded to each plaintiff the difference between his wages and carmen's wages beginning from either one year prior to the filing of the EEOC complaint or his date of qualification, whichever came later, and continuing to the date he was put on furlough.[6]

Second, the court awarded the same pay differential to each plaintiff from the date he was furloughed to the date of his reinstatement as a carman with full seniority.

Third, the court ordered the railroad to make such contributions to the employees' retirement funds as it would have made had the plaintiffs been paid originally as ordered in the court's judgment. In cases in which a plaintiff declined to make his employee contribution to such funds, the railroad was ordered to pay the equivalent of its contribution to the employee directly.

Fourth, based on the average time by which the court found white employees had qualified for carmen's positions, the court ordered plaintiffs hired prior to 1960 to receive carmen's seniority beginning three years from their dates of hire, and plaintiffs hired after 1960 to receive such seniority starting six months from their start of work.

In addition, the court awarded the plaintiffs attorneys' fees and $50,000 in punitive damages.

The railroad challenges the court's calculations as to compensatory damages. We will first consider the appropriateness of the back-pay awards, and analyze the findings of fact on which each award rests. We will then discuss the remaining issues in the case: punitive damages, the unions' liability, and attorneys' fees.

## II. Damages: What is the Rightful Place?

■ The award of damages to each plaintiff, equal to the difference between his and carmen's pay for the period between August 4, 1966, or his date of hypothetical qualification for promotion, and each plaintiff's date of furlough, depends essentially on three factual conclusions: on August 4, 1966, or on some later date, each plaintiff was qualified to work as a carman; none of the plaintiffs was promoted, and this was a result of racial discrimination; and, in the absence of discrimination, each plaintiff would have been promoted on the date he qualified for the position. We consider these conclusions in turn.

First, there was abundant evidence to support the trial court's finding that the plaintiffs were qualified for promotion. This was based in part on his conclusion, also supported by evidence, that, despite variations in the *description* of the tasks of carmen and those of laborers and helpers contained in the relevant bargaining agreements, the *actual* tasks of carmen and helpers in Mays Yard were largely fungible. Black helpers frequently did the same work as carmen. Some successfully served as carmen while white employees were on vacation or sick. Some of the black helpers had performed carmen's tasks for other

---

**6.** "The period for which back pay should begin is determined by July 2, 1965 or the statute of limitations, whichever is later." *Pettway v. American Cast Iron Pipe Co.*, 5 Cir. 1964, 494 F.2d 211, 258. In this case, the one-year statute of limitations was tolled by the filing of an EEOC complaint on August 4, 1967; the back-pay period for all plaintiffs except Tanner thus began, in the trial court's calculations, on August 4, 1966.

railroads. Occasionally, black helpers trained white carmen and carmen apprentices. There was no evidence that white apprentices or white laborers who had been recruited to apprenticeship and who were later promoted to carmen status were any more qualified in any respect than the blacks passed over for promotion. The black plaintiffs who, after 1969, accepted reinstatement as carmen for the railroad received no additional training to enable them to perform their tasks; neither did those laborers who were reinstated. The railroad has not pointed to *any* difficulties it has had in recruiting blacks from the laborers' group to become apprentices and then carmen. Far from being clearly erroneous, the court's conclusions as to the plaintiffs' qualifications were virtually compelled by the record.

Similarly, the court's findings of racial discrimination are amply supported. Although neutral on its face, the job classification and promotional system in effect between 1965 and 1969, in which the existence of a predominantly white apprentice class effectively blocked the upgrading of black helpers and laborers,[7] operated at the very least to " 'freeze' the status quo of prior discriminatory employment practices," *Griggs v. Duke Power Co.*, 1971, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 163, in violation of Title VII. The railroad has failed to demonstrate any business necessity as justification for its maintenance of a promotional system with discriminatory impact. *Parson v. Kaiser Aluminum & Chemical Corp.*, 5 Cir. 1978, 575 F.2d 1374, 1389; *Pettway v. American Cast Iron Pipe Co.*, 5 Cir. 1974, 494 F.2d 211, 244. Furthermore, in view of the fact that an apprentice class existed, the railroad discriminated after 1965 in its failure to hire or upgrade sufficient blacks to apprentice positions.

The calculation of damages must be based on these well-supported premises. The railroad first contends that the trial court failed properly to follow those equitable principles that govern the implementation of relief in Title VII cases. *Albemarle Paper Co. v. Moody*, 1975, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280. Specifically, it asserts that, in calculating back-pay as though each plaintiff were promoted on his date of qualification or the date to which the applicable statute of limitations runs, the trial court ignored the "rightful place" doctrine, under which "injured workers must be restored to the economic position in which they would have been *but for* the discrimination." *Pettway v. American Cast Iron Pipe Co., supra*, 494 F.2d at 252. According to the railroad, only a limited number of vacancies for carmen were available from 1966 on, and damages must be calculated by determining historically which plaintiffs would have succeeded to those positions as they became vacant, and then awarding back-pay only from the dates of the plaintiffs' hypothetical promotions.

The employees do not dispute the need for historical reconstruction, but they view the relevant history differently. In their and the trial court's view, work assignments at Mays Yard did not reflect a fixed number of slots to be filled by members of each of several well-defined crafts. Rather, carmen, apprentices, and helpers did essentially similar work; whites doing this work were promoted to carmen's rank upon completion of a period of apprenticeship and

---

7. Mays Yard, as stated above, employed four classes of employees in its car department in 1965. The highest paid job was that of carman. Carmen were ordinarily recruited from the ranks of apprentices, who were expected to serve four years before entering the carmen's ranks. Where more carmen were needed than could be supplied by four-year apprentices, apprentices with less then four years' service could be "set up" as carmen. Such "set-up carmen" received carmen's pay, but would not enter the carmen's seniority roster until four years from the start of their apprenticeships.

If carmen were needed and no apprentices were available, qualified helpers could be set up. In addition, qualified laborers could be recruited as apprentices or promoted to helpers, and could then be set up. The set up of nonapprentices, however, depended on the unavailability of apprentices for promotion. The upgrading of laborers, like the recruitment of new apprentices "off the street," depended on management's judgment as to qualifications, not seniority.

blacks were not, even when qualified to do and doing carmen's work, solely because of their race. Based on the railroad's treatment of whites, that is, the creation of a carman's slot for every qualified white person, the "rightful place" of each black employee was to be a carman on the day he became fully qualified. This interpretation by the trial court accurately reflects the "rightful place" principle, and is based on factual conclusions that are not clearly erroneous.

We said in *Watkins v. Scott Paper Co.*, 5 Cir. 1976, 530 F.2d 1159, 1168, *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139:

> The rightful place theory is an equitable accommodation between two countervailing interests. The first interest is that of prior discriminatees to achieve what would have been theirs in the absence of discrimination. The countervailing interests are those of employers, employees, and consumers—in maintaining safety and efficiency—and those of employees who acquired their positions within the discriminating system and who would suffer unfairly if required to give up such positions to members of an affected class.

(Citation and footnote omitted.) The aim of Title VII relief, whether back-pay, retroactive seniority, or other injunctive relief, is thus to make whole the victims of discrimination according to what would have been their experience in a non-discriminatory work setting.

We do not require, however, an inflexible and unrealistic reconstruction of the plaintiffs' work history in implementing the rightful place doctrine.

> [I]n computing a back pay award two principles are lucid: (1) unrealistic exactitude is not required, (2) uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer.

*Pettway v. American Cast Iron Pipe Co., supra*, 494 F.2d at 260–61 (footnotes and citation omitted). *Accord, United States v. United States Steel Corp.*, 5 Cir. 1975, 520 F.2d 1043, 1050, *cert. denied*, 1976, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77. The details of the approach must vary with the case. *See Pettway v. American Cast Iron Pipe Co., supra*, 494 F.2d at 261. In *United States v. United States Steel Corp., supra*, we said:

> [T]he district court, with the assistance of the parties, should strive to the fullest practicable degree to award back pay by reconstructing hypothetically each eligible claimant's work history. . . . To the extent that actual, historical vacancies in the employer's workforce can be flowcharted with reasonable accuracy, the court should award the back pay to the minority employees who, in its sound judgment, would have occupied those vacancies but for discrimination, and whose projections show a loss of wages. Part of "[t]he key is to avoid . . . granting a windfall to the class at the employer's expense . . . ." *Pettway, supra*, at 262 n.152. Therefore, if the parties can reasonably reconstruct the history of the changes in the . . . workforce, the court should utilize those data for identifying "vacancies" in light of its decree, and should not presume that additional vacancies occurred. Apart from protecting the defendant, this method has the virtue of distributing the recovery to the victims who, by the greater likelihood, are entitled to it.

> On the other hand, the remainder of "the key" is to avoid "the unfair exclusion of claimants by defining the class or the determinants of the amount too narrowly." *Id.*

520 F.2d at 1055. In *United States Steel*, the risk of a potential windfall was especially acute; the plaintiff class comprised over 3,000 black employees and the employer's work force was organized along intricate lines of job progression and overlapping systems of seniority. In the present case, the hypothetical promotion of each of the 27 plaintiffs on the date he became qualified for promotion is not a mere presumption of additional vacancies; it reflects a realistic reconstruction of the history of

the employer's workplace, with due regard for the "make whole" purpose of Title VII and the rightful place theory.

The factual conclusions underlying the trial court's determination of the plaintiffs' rightful places are not clearly erroneous. The trial court found that sufficient carmen's work existed to permit all plaintiffs to have been promoted; this conclusion is buttressed by the court's findings that carmen and helpers shared a pool of tasks, with the black plaintiff helpers often doing carmen's work, but at helper's pay. The court further found that, since 1960, all the white employees have been upgraded as soon as they were qualified. Indeed, of 107 white laborers hired from 1960 to 1971, all but one who remained with the railroad were made carmen. Only four or five of the 31 black laborers hired in that period were made apprentices.

Finally, the employer's effort to "flowchart" the vacancies in the carmen's craft since 1966 belies any historical certainty inherent in that approach. The proffered flowchart indicates that between 1965 and 1969, 15 vacancies in the rank of carmen occurred because of resignation or retirement. Yet 27 employees were promoted to carmen's positions in that time. The first black employee so promoted was upgraded on August 30, 1967, after the EEOC complaint from which this action arose was filed. Twenty-two persons were promoted before any plaintiff in this case was upgraded. Given these facts, the railroad's assertion that the flowchart presents a picture of actual vacancies based on resignations, retirement, or work availability is merely a competing hypothesis that does not require reversal of the trial court's approach, which is based on substantial evidence.

### III. Damages: The Effect of Failure to Seek Promotion

The court's determination, however, that the plaintiffs historically should have been promoted on the dates they became qualified does not in all cases warrant the calculation of back pay from those dates. Some of the plaintiffs did not formally apply for apprentices' or carmen's positions. This must be taken into account in calculating back pay in the light of *International Brotherhood of Teamsters v. United States*, 1977, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, rendered after the trial court's disposition of the case.

The teaching of *Teamsters*[8] is that an employee who is a victim of discrimination is due redress from the date he sought relief from his employer and was denied it as a result of the employer's discriminatory policy; the employee's failure to seek relief permits redress from an earlier date only if the employee can prove that he was deterred from applying by the employer's inflexible discriminatory policies:

> A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.

*Id.* at 365, 97 S.Ct. at 1869, 52 L.Ed.2d at 433–4.

> [A]n incumbent employee's failure to apply for a job is not an inexorable bar to an award of retroactive seniority. Individual nonapplicants must be given an opportunity to undertake their difficult task of proving that they should be treated as applicants and therefore are presumptively entitled to relief accordingly.

*Id.* at 364, 97 S.Ct. at 1869, 52 L.Ed.2d at 433. Such proof requires more than a bare showing that the discriminatees were aware of their employer's discriminatory policies. In deciding an employee was denied promotion as a result of discrimination, and not his failure to apply, a court must consider his qualifications, the costs and benefits to him of a change in his work assignment,

---

**8.** Although *Teamsters* involved the award of retroactive seniority, no logical reason supports the application of different principles with respect to awards of back pay, the objective of each remedy is the same, to make victims whole and restore them to their rightful economic places.

and the potential sacrifice of the benefits or seniority that had accrued to him based on his past service in the lower position. *Id.* at 364–71, 97 S.Ct. at 1869–73, 52 L.Ed.2d at 433–7.

■ Because the issue of non-application is significant, and because neither the parties nor the trial court, which rendered its back pay awards three years prior to *Teamsters,* squarely faced the issue, we vacate the court's judgment as to pre-furlough back-pay and remand for express findings whether, in view of the railroad's discriminatory policies, the plaintiffs' qualifications, and the potential costs and benefits of accepting promotion, any plaintiff who did not apply for promotion should be treated as an applicant. As to those plaintiffs who did apply on or before the dates from which back pay has been calculated in their cases, the trial court may simply reinstate its pre-furlough damage awards *in toto.* The burden of justifying any failure to apply lies with the plaintiffs.

In remanding for findings on this issue, we are aware that the record is not barren. Reviewing the factors mentioned in *Teamsters* with respect to the helpers, we find evidence that the plaintiffs were qualified for promotion; that a carman's position is preferable to a helper's; and that, under the railroad's set-up system, a helper promoted in 1965 or in 1966 would have risked nothing in seniority by accepting a position as set-up carman. For four years, helpers set up as carmen retained seniority as helpers and had to decide only after that time either to revert to helper status or to take the bottom rung on the carmen's seniority roster. Whether each helper after four years would have decided to become a carman is a purely speculative matter based on an historical contingency—namely, a proper promotion four years earlier—that the railroad prevented from occurring. Because what would have happened is wholly uncertain, and the uncertainty is attributable to the railroad, it must be presumed, in plaintiffs' favor, that they would have chosen to continue to be carmen and to receive the higher rate paid for that position.

If upgraded, the laborers presumably would have sacrificed craft seniority. Although the trial court determined that only two plaintiff laborers would have had more than six months of seniority at the time of their hypothetical upgrading, the testimony of these two, Levester Griffin and Isiah Hill, indicates that both made attempts to secure promotions, notwithstanding any potential loss of accrued benefits.

However, because the issues had not yet been appropriately framed, and not faced directly, the railroad did not submit the evidence it may have had to rebut the plaintiffs' position, now retroactively constructed. Both parties should, therefore, be given the opportunity to adduce any further evidence that might affect whether each employee should accrue back pay from the date of eligibility for promotion or whether it should, in view of any individual's failure to seek a carman's job, be computed only from a later date.

## IV. Effect of the Furlough

■ In addition to awarding pre-furlough back-pay, the trial court awarded each plaintiff the difference between his earnings and carmen's pay for the period between his furlough and "the date he is offered reemployment as a carman with correct seniority status."

Each of the plaintiffs was furloughed from his job at Mays Yard on November 3, 1969 or on December 1, 1969, after a work efficiency study had been undertaken at the direction of the railroad's management. Eight of the furloughed plaintiff helpers worked on the "prepare track," which serviced cars going to or just returning from shippers. The plaintiff laborers also worked on the prepare track, and the remaining 13 plaintiff helpers were employed in the train yard.

The trial court concluded that furloughing the prepare track helpers was racially discriminatory. The work efficiency study of the prepare track recommended a reduction of the work force totalling 16 carmen and 14 laborers. The report did not specifically define "carmen" as including carmen,

apprentices, helpers, or any combination. There was testimony, which the trial court credited, that the work on the prepare track done by persons absorbed in these groups was indistinguishable, and that the report intended merely to recommend that 16 persons doing such work be furloughed. This is apparently the way the railroad interpreted it, for it effected the report's recommendations by furloughing all of the helpers, who were black, and only three white carmen. Of the three white carmen furloughed, one resigned and the railroad promoted the two others to other positions. It made no such effort to assist the prepare track helpers to find work. The court's conclusion is thus amply supported.

Because the layoff of the prepare track helpers was racially discriminatory, the court ordered that they receive back-pay from their date of furlough. It further held:

> In addition, though the furloughing of the other plaintiffs was not racially motivated, it is nevertheless appropriate that they, too, receive such back pay since the furlough had a severe discriminatory racial effect upon them due to the former practices of the defendant. In fact, 32 of the 35 men furloughed were black. The plaintiffs all should have achieved carman status before the date of the furlough, in which case they would have been protected from such a layoff, especially if each had been given his proper seniority date.

As determined by the court, the plaintiffs' proper seniority dates, as carmen, would have been three years from their date of hire for all plaintiffs hired prior to 1960, and six months from their date of hire for all plaintiffs hired subsequently.

Unfortunately, the record before us demonstrates insufficient evidence for the district court to have determined whether each of the plaintiffs would, in fact, have been retained by the railroad had the railroad not discriminated against the prepare track

helpers or failed to promote the plaintiffs to carmen's positions at the correct times. Either discharges on account of race, or discharges that would not have occurred but for the railroad's failure to correct its prior discriminatory practices, would violate Title VII. The issue with respect to the calculation of damages is not whether such acts violate Title VII, but whether such discrimination, and not the plaintiffs' lack of seniority, even if properly calculated in this case, made them vulnerable to layoff.

Our difficulty is exacerbated because the *Teamsters* case makes clear that the award of retroactive seniority prior to July 2, 1965 in this case was error. In reversing this court, the Supreme Court unambiguously said: "[N]o person may be given retroactive seniority to a date earlier than the effective date of the Act." 431 U.S. at 356–7, 97 S.Ct. at 1865, 52 L.Ed.2d at 428. The trial court on remand in this case must thus consider whether the plaintiffs, if given seniority as of July 2, 1965 or on their dates of qualification for promotion, whichever came later, would have been protected from a non-discriminatory furlough. To grant relief on any other basis would effectively give the plaintiffs retroactive seniority relief antedating the Act. The basis for an award of reinstatement or back-pay must be to make the plaintiffs whole; to grant such relief unless, but for the railroad's discrimination, the plaintiffs would not have been furloughed, would overstep that target.

In reconstructing the claimants' work history and the likely effects of a non-discriminatory furlough on the plaintiffs, the court must, of course, determine whether the rules by which the seniority rosters were kept after July 2, 1965 operated in any way to lock in the effects of prior discrimination.[9] Specifically, the court must determine whether any plaintiff hypothetically set up as a carman in 1965, more than four years prior to his furlough, could have been compelled, in a non-discriminatory system,

---

**9.** As the Supreme Court has noted, post-Act seniority relief is essential to the make-whole purposes of Title VII. *Franks v. Bowman*

*Transportation Co.*, 1976, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444.

to forego those four years of company seniority in entering the railroad carmen's seniority list at the bottom rung four years after being set up. The plaintiffs' history must be hypothesized in a fully non-discriminatory system, purged as far as possible of the effects of pre-Act discrimination, and uncertainties in resolving each employee's rightful place must be determined in the employee's favor.

## V. Effect of Offer of Reinstatement

The railroad argues that the cut-off date for any post-furlough back-pay award should be the date of its offer to each plaintiff of unconditional reinstatement. The trial court rejected this contention, holding that no plaintiff should be penalized for rejecting an offer of reinstatement that did not include back pay and seniority relief as well.

 On remand, the trial court must reconsider the cut-off date for any post-furlough relief it awards, following a course set by principles of equity, which govern Title VII relief. *Albemarle Paper Co. v. Moody, supra.*[10] As the court below recognized, each plaintiff bore a duty to mitigate damages. Failure to accept an offer of reinstatement in a Title VII case does not necessarily terminate the right to relief, so long as those amounts earned elsewhere or earnable with reasonable diligence are deducted from each plaintiff's award. 42 U.S.C. § 2000e–5(g). In determining whether the right to relief extends beyond the date of an offer of reinstatement, the trial court must consider the circumstances under which the offer was made or rejected, including the terms of the offer and the reasons for refusal. Such reasons as the trial court gave for a *per se* rejection of the railroad's position, for example, the difficulty elderly plaintiffs had in finding substitute work and the disadvantages to them of returning to the railroad without retroactive seniority, would more than justify a *particular* employee in refusing an offer of reinstatement. Whether each employee was reasonable in rejecting reinstatement must be determined separately for every employee who did not accept reinstatement and who, according to the trial court's findings, would not have been furloughed.

## VI. Punitive Damages

 In addition to compensatory relief, the trial court awarded $50,000 in punitive damages under Title VII and under 42 U.S.C. § 1981.[11] The railroad, supported by

---

10. In rejecting the railroad's position on the effect of offers of reinstatement, the trial court originally adopted the reasoning of *Jurinko v. Edwin L. Wiegand Co.*, 3 Cir. 1973, 477 F.2d 1038. Although *Jurinko* would not be binding on us in any event, the subsequent history of that case buttresses our conclusion that a case-by-case approach to the rejections of offers of reinstatement is appropriate. The Third Circuit held in *Jurinko* that an offer of reinstatement did not necessarily end the effects of past discrimination, and that a refusal to accept such an offer that did not remedy past discrimination was *per se* reasonable. 477 F.2d at 1047. The Supreme Court subsequently vacated the judgment in *Jurinko,* and remanded for reconsideration in light of *McDonnell Douglas Corp. v. Green*, 1973, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. *Judgment vacated,* 1973, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214. The Third Circuit, in an unpublished opinion, decided to adhere to its first opinion; then, in a published opinion, it reconsidered and remanded to the district court for findings of fact. 3 Cir. 1974, 497 F.2d 403. The district court reconsidered, but mistakenly followed the Third Circuit's unpublished opinion. The Third Circuit again remanded, 3 Cir. 1975, 528 F.2d 1214, for further consideration of the case, including the effect of offers of reinstatement, in light of *Albermarle Paper Co. v. Moody, supra.* As the Third Circuit said, *Albermarle Paper Co.* "emphasize[s] the equitable nature of an award of back pay in cases under Title VII of the 1964 Civil Rights Act and the responsibility of the district court to decide each back pay controversy in a way calculated to achieve a just and equitable result in the circumstances of the case before it." 528 F.2d at 1216 (citations omitted).

11. 42 U.S.C. § 1981 reads:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

the United States Chamber of Commerce as *amicus curiae*, does not contest that the plaintiffs have established a case for liability under section 1981; rather, they argue that Title VII does not permit the award of punitive damages, and that joining a Title VII claim with a claim under section 1981 does not expand plaintiffs' rights in that respect.

Pretermitting the issue whether an award of punitive damages under Title VII alone would be proper, we are persuaded that such an award under section 1981 is permissible, even when the section 1981 claim is joined with Title VII claims. Although the statement was dictum with respect to the case before it, the Supreme Court said in *Johnson v. Railway Express Agency, Inc.*, 1975, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295:

> An individual who establishes a cause of action [for discrimination in private employment] under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages.

(Citations omitted.) This interpretation parallels the Court's construction of 42 U.S.C. § 1982, which also makes no specific provision for relief, but under which punitive damages have been allowed. *See Sullivan v. Little Hunting Park, Inc.*, 1969, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386; *Jones v. Alfred H. Mayer Co.*, 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189.

Without approving or disapproving the lower court's resolution of the Title VII issue, its discussion of Title VII and the different purposes of the Civil Rights Act as compared to the National Labor Relations Act, 29 U.S.C. § 160(c), *Claiborne v. Illinois Central Railroad*, E.D.La.1975, 401 F.Supp. 1022, is fully persuasive that an award of punitive damages does not so conflict with the purpose embodied in Title VII that it should be disallowed in a combined suit. In so holding we join the Eighth Circuit's conclusion in *Allen v. Amalgamated Transit Union Local 788*, 8 Cir. 1977, 554 F.2d 876, 883–4, *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176, and respectful-ly disagree with the contrary view expressed by our colleagues of the Sixth Circuit, *EEOC v. Detroit Edison Co.*, 6 Cir. 1975, 515 F.2d 301, 309, *vacated*, 1977, 431 U.S. 951, 97 S.Ct. 2669, 53 L.Ed.2d 267.

■ Having determined that a punitive damages award under section 1981 is permissible, we also find no abuse of discretion in the grant of such an award in this case. The railroad's intransigence in failing before this suit was filed genuinely to redress any of its prior discriminatory acts, plus its additional acts of post-Act discrimination, such as testing only black helpers to evaluate their asserted "deficiencies," supports the court's view that the defendant acted with malice with respect to its black employees.

The trial court's judgment with respect to punitive damages is affirmed.

### VII. The Claim for Contribution by the Union

■ The railroad, but not the plaintiff employees, challenge the trial court's conclusion that the unions to which the plaintiffs belonged did not violate their duty of fair representation to minority members. *Steele v. Louisville & Nashville Railroad Co.*, 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. The trial court's judgment in this respect is, of course, adverse to any right of contribution against the defendant unions held by the railroad. Had the railroad cross-claimed for contribution below, it would be proper for us to review the court's judgment insofar as it adversely affects the railroad's interests. However, it is elementary that we ordinarily may not review *issues* presented for the first time on appeal; this rule applies *a fortiori* to *claims* never presented to the trial court. Because the railroad stated no cross-claim, the unions not only have had no opportunity to present their defenses, if any, to contribution, but also, with the railroad's acquiescence, withdrew in the middle of the hearing below on damages. This case does not fall within that limited class of purely legal issues that may be decided initially on appeal to prevent a miscarriage of justice.

*Martinez v. Mathews*, 5 Cir. 1976, 544 F.2d 1233, 1237. The unions' liability to the railroad, if any, must be decided in a separate suit.

### VIII. Additional Attorneys' Fees

Finally, we are presented with the plaintiffs' cross-appeal for additional attorneys' fees. In challenging the court's award, the plaintiffs contest only the disallowance of 100 hours charged by each counsel for "miscellaneous" conferences. The plaintiffs assert that, although they ordinarily failed to keep time records for work of less than one hour's duration, they estimated that each attorney spent 24 minutes per week with respect to phone calls, conferences, and the preparation and review of correspondence.

It is familiar law that an award of attorneys' fees and its calculation in a Title VII action are matters left for the sound discretion of trial judges. *E. g., Baxter v. Savannah Sugar Refining Corp.*, 5 Cir. 1974, 495 F.2d 437, 447, *cert. denied*, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308; *Johnson v. Georgia Highway Express, Inc.*, 5 Cir. 1974, 488 F.2d 714. As we observed in *Baxter v. Savannah Sugar Refining Corp., supra*, a variety of equitable considerations are involved in awarding attorneys' fees in an employment discrimination suit. Among them is regard for the nature of the action itself:

> Due to the nature of public rights being vindicated, the award should be in such an amount to insure that attorneys will undertake representation in this type of case.

495 F.2d at 447 (footnote omitted).

In the present case, we have noted the total award, the defendants' failure to contest the time claimed, and the purpose of attorneys' fees awards in Title VII. In view of these factors, compensation for the miscellaneous time might have been appropriate but we cannot say that its disallowance was an abuse of discretion. However, additional work has been required of counsel on appeal, and will be required on remand. The district court should, in supplementing its awards of attorneys' fees, take the *Johnson* factors and the nature of the rights being vindicated fully into account. It may require counsel to submit further affidavits or other evidence, if necessary, to assist in this determination.

### IX. Affirmance and Remand

The court's judgment of October 16, 1974, with respect to back pay, retirement contributions, and the terms and conditions of reemployment is VACATED, and the case is REMANDED for a redetermination of the amount due each claimant in accordance with the standards set forth above and the additional attorneys' fees due the plaintiffs' counsel. The judgment is in all other respects AFFIRMED.

AFFIRMED in part; Vacated and Remanded in part.