**UNITED STATES of America**

v.

**THREE JUVENILES.**

**Crim. A. No. 94–10181–PBS.**

United States District Court,
D. Massachusetts.

May 1, 1995.

Stephen R. Wainwright, Brockton, MA, for Juvenile Male 1 (1).

Willie J. Davis, Davis, Robinson & White, Boston, MA, for Juvenile Male 2 (2).

Karnig Boyajian, Boston, MA, for Juvenile Male 3 (3).

Jonathan M. Albano, Bingham, Dana & Gould, Boston, MA, for Globe Newspaper Co. (4).

S. Theodore Merritt, U.S. Attorney's Office, Boston, MA, for U.S.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF ENTRY OF JUDGMENT

SARIS, District Judge.

On July 19, 1994, the government filed a 3-count information against SP, JF, and WR, pursuant to the Federal Juvenile Delinquency Act, 18 U.S.C. § 5031 *et seq.* Count One charges the defendants with a conspiracy from June, 1993 until May, 1994 under 18 U.S.C. § 241 to intimidate Jewish citizens in the Brockton area. Count Two charges the defendants with a conspiracy during the same time period under 18 U.S.C. § 371 to intimidate black citizens in the area, in violation of 18 U.S.C. § 245(b)(2)(B) and (F). Count Three charges SP with making false statements to the FBI, in violation of 18 U.S.C. § 1001.

The trial, which was closed to the public pursuant to 18 U.S.C. § 5038(e), was held from December 14 to December 23, 1994. After weighing the evidence and the credibility of the witnesses, on December 23, 1994, this Court found that the government had proven beyond a reasonable doubt, that the defendants were guilty as charged on Counts One and Two. The Court found defendant SP not guilty on Count III. The Court also orally issued certain special findings from the bench but granted defendants' counsel timely request to seek additional special findings pursuant to Fed.R.Crim.P. 23(c). My special findings follow. All references to juveniles

will be by initials pursuant to 18 U.S.C. § 5038.

Sentencing is scheduled for May 25, 1995. From the outset, it is worth emphasizing that this case is not about defendants' First Amendment rights to freedom of speech and association, but about their *actions* which violate the federal civil rights laws and fall outside the protection of the First Amendment. *United States v. J.H.H.*, 22 F.3d 821, 825 (8th Cir.1994).

## I. Findings of Fact

### 1. *The New Dawn Hammerskins*

The New Dawn Hammerskins (NDH) was a skinhead group which consisted primarily of young men from the Brockton area. Members of the NDH believed that the Brockton area was overrun by Blacks and Jews, and favored the adoption of abusive tactics in order to scare them into leaving. The NDH was formed in the late summer or early fall of 1993.[1] It was organized into a military-type hierarchy, with "chairmen" at the top and "shock troops" at the bottom.

One of the leaders of this group was an adult, Brian Clayton, age twenty, who was a self-proclaimed neo-Nazi skinhead, and who believed in acts of terrorism. He was indicted in a connected case with violations of 18 U.S.C. § 241 and 18 U.S.C. § 371, entered a guilty plea, and has been sentenced. Another leader was Michael Rasnick, age twenty-five, who was an immunized cooperating witness at the trial of the juveniles. Rasnick was a self-avowed white supremacist and separatist. He believed that Jews should be shipped off to Israel and Black people to Africa. He thought of himself as an opponent of the "Zionist Occupied Government", which NDH members referred to by the acronym "ZOG". Rasnick had a troubled background. A school dropout with a juvenile record, he was diagnosed as having attention deficit disorder (A.D.D.), and was receiving counselling by order of the Brockton Court for antisocial personality disorder.

Rasnick spent some of his adolescence homeless because of bitter and violent altercations with a stepfather who is Jewish.

Another leader and founder of the group was SP, then 17, and a juvenile. During the 1993 school year, SP began to brandish skinhead fashion styles—a shaved head, combat boots,[2] suspenders, and flight jackets. He sometimes wore a red Nazi armband. He told a friend, CR, that he believed too many Jews lived in Brockton and that they should be sent to Israel. He also expressed the belief that whites are better than Blacks. He called Jews "kikes" or "ZOG" and African–Americans "niggers." SP told a friend, CR, that he wanted to form a group to run Jews and Blacks out of Brockton by scaring them with such tactics as "bashing" Blacks and "tagging" or spray painting Nazi and white supremacist symbols like swastikas, Celtic crosses and iron crosses. SP was interested in becoming involved in a "race war" in which whites and non-whites would do battle to wipe out the other races. He also was interested in becoming a national socialist. SP planned to join the service in order to train for the race war. (He has since joined the Navy, and, in light of this case, been administratively separated).

In the late summer of 1993, Brian Clayton asked his young cousin, EC, now seventeen, to join the NDH. EC agreed to join and appeared at an initiation ceremony at Rasnick's house attended by SP, Clayton, and JF. The task of conducting the inquiry fell to SP. He asked EC his religion, his views on interracial dating, and his opinion on different races, and extracted a promise that he would not "rat out" any members of the NDH if arrested. After EC answered all the questions satisfactorily, Brian Clayton cut off EC's hair in the kitchen, and they saluted "Heil Hitler." Based on statements made by members of the group that night, EC learned that Brian Clayton was the leader of the group, SP was in charge of "security" and Rasnick was the treasurer. Rasnick was also

---

1. The NDH was not the only white supremacist group in Brockton. Another group was the Confederate Vanguards.

2. Even the color of the laces in the skinhead combat boots had significance. Clayton wore red laces to symbolize his commitment to Nazi-like acts of violence to accomplish racial purity. Those in favor only of white supremacy or separatism wore white.

the person who could provide EC with weapons. EC's job was to get new recruits.

An active juvenile member of the group was co-defendant JF, who became a skinhead in approximately June, 1993. He turned fifteen years old on June 8. He dressed in the fashion which typified skinhead groups: he had a shaved head, and wore a flight jacket, army boots and suspenders called "braces." He dated a seventeen year old girl named NB for three weeks in June, 1993; she later dated Brian Clayton in September, 1993 and spent time with the NDH, overhearing the views of the members on Jews and Blacks. JF stated that he believed that different races shouldn't intermarry; that Jews were a different "race" than whites; and also used the term "Zionist Occupied Government" or ZOG to refer to a movement of Jewish people to send money to Israel. Although he had one Jewish parent, his mother, he referred to Jews as "kikes", and Blacks as "niggers, coons or spooks." He told Rasnick that Blacks should be kicked out of Brockton through beatings and bashings. He also told Rasnick he wanted to get rid of ZOG through acts of violence.

Another young recruit was SM, who was fifteen. Again, SP was the leader of the initiation ceremony which took place in SM's backyard. SM's role was limited. He went to the Westgate Mall once with the group, and went to one meeting at Brian Clayton's house.

SP and JF joined the NDH and agreed with other members to desecrate Jewish synagogues in the Brockton and nearby areas and to vandalize other personal property owned by Jewish residents. Their specific intent was to intimidate Jewish residents and drive them out of the area. Similarly, defendants agreed with other NDH members and took actions to implement a plan with the specific intent to intimidate black residents through acts of violence into leaving the Brockton area and to interfere with their use and enjoyment of the streets and sidewalks of Brockton and the Westgate Mall, a place of exhibition and entertainment.

### 2. The Karp Incident

In the spring of 1993, before he became a member of NDH, JF had read Hitler's *Mein Kampf* and was already a believer in the Nazi world view. He had a confrontation with Ms. Judith Karp, who taught about the Holocaust as part of her high school English class. JF, who then looked like other high school students, told Karp of his admiration for Hitler, and that he was regretful that Germany had not been successful in purifying itself by getting rid of the Jews and Zionists. They disagreed, needless to say, and JF grew angry at her unwillingness to hear his views, which she called "stupid." JF was also angry because he had in the past been attacked by some black students at Brockton High School, and felt the school was insensitive to the needs of white students. He believed that Ms. Karp, whom he knew to be Jewish, was a member of ZOG.

Because Ms. Karp lived near NB, he knew where she lived, and once he became a member of NDH in the late summer, he planned to take action to intimidate her into leaving the Brockton area. At about 10 p.m., on September 10, 1993, he slashed four tires on Ms. Karp's car, which was parked in the driveway of her residence in Brockton. He also carved the initials ZOG into the paint of her car.

### 3. The Assault on 2 Young Black Girls

In September, 1993, Clayton, SP, JF, and EC met in Clayton's room. JF suggested going "bashing." Clayton kept a number of baseball bats in his room for that purpose. They piled into a vehicle,[3] and proceeded to the Westgate Mall in Brockton where many black residents shop. In the vehicle were

---

**3.** There is some dispute over the nature of the vehicle. In his suggested findings of fact, SP argues that the testimony of EC—which forms the main basis for the court's findings with regard to this particular incident—is wholly incredible because he refers to the vehicle as a pick-up truck rather than a van. The court does not find this discrepancy so serious as to undermine the credibility of the testimony. Regardless of whether EC was mistaken about the motor vehicle or whether SP was driving a different motor vehicle that night, I found EC wholly credible in his demeanor. Moreover, his credibility is buttressed by the fact that he was providing information which adversely affected his cousin.

the baseball bats and a stick from a tree. Clayton stapled a confederate flag onto the truck, and SP was wearing a Nazi armband. Clayton stared at black shoppers and on one occasion made a racial slur. The group, attired in their typical menacing skinhead fashion, were ejected from the mall by the manager.

When they returned to the vehicle, SP was driving, and Brian, JF and EC were in the bed of the vehicle. JF spotted two black girls, about twelve to fourteen years old, walking on E. Ashland Street in Brockton, and he grabbed the stick they had brought along. When SP drove closer, JF said: "Get out of Brockton, you fucking niggers." He then threw the stick at one of the girls, striking her in the leg. They ran away, but never reported the incident to the police. Their identities are unknown. The streets and sidewalks of Brockton are facilities provided and administered by the City of Brockton.

### 4. *The Desecration of Temple Beth Emunah*

On Saturday, October 9, 1993, at Rasnick's house, Clayton, JF and another juvenile, SP, gathered around the kitchen table. They viewed various pamphlets espousing skinhead and neo-Nazi views, and planned an act of vandalism against a Jewish temple in Brockton in order to memorialize the death of Ian Stewart, a skinhead rock singer. Clayton and SP in the past had expressed a desire to commemorate Kristallnacht, literally the night of broken glass, a night of rioting directed against Jewish houses, businesses and temples, orchestrated by the Nazis in 1938. Rasnick refused to go because he was caring for his young son. Clayton, SP, JF and NB got into SP's family van. At the nearby Westgate Mall, Clayton gave NB money and instructed her to purchase white spray paint. On a street close to Temple Beth Emunah, the youths exited the van, leaving NB behind—but not the spray paint, which Clayton concealed under his coat. On a wall of the temple they painted a swastika, and wrote "In Memory of Ian Stewart." After the act of vandalism, they ran back to the van. JF told NB: "We did a tribute to Ian"

and pointed to the Temple. The next morning, members of the temple, including fifth and sixth grade students, saw the Nazi graffiti and were upset by it. N.B., upset by the incident, told her friend, who was part of the Temple Emunah youth organization, about it.

Temple Beth Emunah had been vandalized in the late summer with Nazi slogans on its walls. Although there is insufficient evidence to conclude beyond a reasonable doubt that the NDH, or any one of the defendants, was the perpetrator, the earlier incident bears on defendants' intent. The earlier incident—and its upsetting effect on the members of the synagogue—had received widespread publicity. Clearly, the NDH members intended the October attack to have an in terrorem effect on the temple congregants, to persuade them to move out of the area and to interfere with their use and enjoyment of the temple property. Indeed, the congregants hired security guards to protect the members and temple property after the first incident. Temple Beth Emunah is owned by a non-profit corporation in which its members, residents of the Brockton area, hold shares.

### 5. *The Desecration of Temple Young Israel—Kehillath Jacob*

In October, 1992, Rasnick persuaded WR, who was already a skinhead, to join the NDH. WR was then fifteen years old. On October 16, 1992, at night, Clayton, JF, SP and WR drove to Temple Young Israel—Kehillath Jacob in Randolph, Massachusetts. This temple is also owned by a non-profit corporation in which its members, Jewish citizens, hold shares. SP spray painted "Toten Ganz Juden", which means "all Jews must die" on the synagogue wall. JF painted a "white power" fist. Clayton wrote ZOG. WR was present in order to assist and serve as a lookout.

Two elderly brothers, who were Holocaust survivors, saw the symbols the next day and wept.

### 6. *The Ride to Vulcan Bar*

On October 23, 1992, Clayton, SP, JF and Rasnick met and conjured up another Saturday night escapade to fulfill the goals of the

NDH. This time they sought to retaliate for the jury verdict exonerating the black defendants accused of assailing Reginald Denny, a white truck driver, during the 1992 riots in South Central Los Angeles. They resolved to "bash" blacks by kicking them with their army boots and beating them with their bats. They also intended to spray paint the victims white. JF called up WR and told him about the plan. WR agreed to the venture, and SP picked them up in the van. They proceeded to an abandoned arsenal to get bricks to add to their arsenal, and drove the van to the Vulcan Bar, which the NDH members knew was frequented by Cape Verdeans. Despite all their braggadocio, when they approached the bar, their willpower failed. Rasnick attributed the failed attack on the improvident appearance of a skunk in front of the bar. Whatever the reason, they retreated, and brought WR home. A few moments later, they were pulled over by the police, and videotaped by a television camera crew. The police found 8–10 bricks, several baseball bats, and a green military canvas bag filled with cans of spray paint. Although they made no arrests, the police confiscated the spray paint and the bricks. SP, by no means shy, exercised his first amendment rights by expressing his white separatist views to the press.

### 7. *November, 1993*

In November, 1993, SW, a senior at Southeastern Regional High School in Brockton, joined the group. While driving with SP in his van, he would see weapons like a wooden stick engraved with the words "nigger be good." SP, Clayton, and SW talked about vandalizing a Jewish cemetery, but abandoned the plan because investigation of the NDH was underway.

### 8. *Scenes from Westgate Mall*

On one occasion in November, 1993, SW, SP and Clayton went to the Westgate Mall with the specific intent to harass Black patrons from using and enjoying the mall. In a Lauriat's Bookstore in the mall, Clayton approached an African–American couple browsing through magazines near the front of the bookstore and called them "mud people,"

adding that people "like you don't belong here. Go back to Africa." He also said he wished he had a gun and that they would "die in a race war." The others cheered Clayton on. These remarks were uttered in a loud enough voice that the couple could hear them. The couple complained to the assistant manager: "That's why we don't come to—that's why we don't like to come to this mall." Later, in the mall's garage, SW, SP and BC saw a black and white couple entering a car, and SP and BC called them "race traitors."

The Westgate Mall, located in Brockton, Massachusetts, is an enclosed mall with eighty-seven stores. The mall management is handled by a group of merchants which seeks to attract patrons through entertainment events in the mall's common space—events such as home shows, car shows, fashion displays, and Santa Claus exhibitions. There are also eight restaurants. The Lauriat's Bookstore is within the enclosed area of the mall. The patronage of the Westgate Mall is about forty to fifty percent minority.

### 9. *The Demise of the NDH*

In December, 1993, the group began to fall apart. While they all believed in white supremacy, Rasnick and JF became uncomfortable because they believed that the organization was being dominated by the neo-Nazi views of Clayton, who continued to advocate acts of terrorism. They were also fearful of the intensifying police investigation. The FBI became involved in November, 1993.

### II. **Motions to Suppress**

After the start of trial on December 16, 1994, defendants SP and WR filed motions to suppress their statements as involuntary under the Fifth Amendment (See Docket 72, 74). The court denied the motions as untimely filed on the ground the Court had ordered that all such motions be filed by September 9, 1994 (Docket 9). However, because of the extra-sensitivity which must be afforded juveniles, the court took evidence concerning the voluntariness of the juveniles' statements, which bears as well on the reliability of those statements. The court makes the following fact findings concerning the

investigation, findings which are relevant only to the issue of voluntariness.

### 1. *Interviews*

The FBI case agent was Thomas Finn, Jr., who has been with the FBI for seventeen years. He interviewed JF on November 19, 1993, at which time JF denied knowledge about Ms. Karp's car or the desecration of the temple.

On January 14, 1994, Finn went to SP's home to interview him. He spoke to S.P.'s parents, as SP was not at home, and scheduled a date to return to talk about SP's involvement in the various anti-Semitic and racist attacks. Finn returned to S.P.'s house with AUSA Theodore Merritt, and interviewed him in the kitchen in the presence of his parents. SP was then seventeen, and a senior in high school. The interview lasted about one hour and a half. His parents told him to cooperate because they feared he would be put in jail. SP admitted to having white separatist views but denied being a neo-Nazi. He also discussed the views of the co-defendants. He did not mention the NDH, and denied involvement in any temple desecrations or racial attacks. He was not read his Miranda rights, and was not arrested after the interview. Finn did not intend to arrest him when he arrived at the interview. The interview was non-custodial. SP, who had no prior arrests, remained calm, relaxed and respectful throughout the interview. His parents had told him to cooperate. S.P.'s will was not overborne, and his statements were knowingly, freely and voluntarily made.

On Thursday, June 30, 1994, at about 10:30 a.m., Finn went to WR's house with two local police officers—Robert Thibeault, who was in uniform, and Officer Robert O'Keefe. At the time, WR was sixteen years old. When they knocked on the door, WR appeared. Finn identified himself and the officers, and WR agreed to talk to them. He had been forewarned about the FBI investigation by JF and Brian Clayton. Finn had already been informed by Rasnick that WR had participat-

ed in the defacement of Temple Young Israel. He was a suspect in the investigation, but not yet a target.

WR let Finn and O'Keefe into the kitchen. Finn advised WR that he was implicated in certain attacks on the temple. WR didn't call his parents because he didn't want them to know about the incident. Unlike the interview conducted with SP, this interview had not been set up in advance, and no adult was present. During the interview, WR took two phone calls. WR implicated JF in the Karp tire slashing, described the membership and views of the NDH, confirmed the incident at the Vulcan Bar, but denied involvement in the desecration of Temple Young Israel in Randolph. When Finn accused him of lying about the Randolph temple, WR recanted, and admitted his involvement. At that point Trooper O'Keefe gave WR his Miranda rights, and WR gave the law enforcement officers a description of the role of each of the defendants and co-defendant Clayton in the Randolph desecration. According to WR's account, he had been directed to be a lookout. Neither Finn nor O'Keefe had any intention of arresting him at that time. However, they had gone there with the intention of serving a grand jury subpoena. At the conclusion of the interview, which lasted about an hour, he was served with a grand jury subpoena to appear on July 5, 1994.[4]

In the interim WR spoke to his parents, and went with his father to an attorney to seek advice. Because his family was experiencing some financial problems, they made a decision not to seek an attorney to appear on WR's behalf at the grand jury proceeding. WR had gone to this attorney before in conjunction with a prior criminal problem. WR had been arrested, handcuffed, read his Miranda rights, charged, and convicted as a juvenile in 1992.

On July 5, 1994, WR went with his father to the Office of the United States Attorney. In a pre-grand jury meeting which lasted about two hours, AUSA Merritt told WR

---

4. There is no evidence that the grand jury subpoena had an advice of rights form attached, but

my notes are unclear on this point.

that he was likely to be charged with federal criminal violations. Merritt also advised him that he might be charged with state criminal law violations. Merritt did not read him his Miranda rights. There is no evidence that WR made any inculpatory statements at that pre-grand jury stage of the interview. WR was not in custody and was not arrested. WR's father advised his son to cooperate. WR went into the grand jury room where Merritt read him his Miranda rights, to the extent required by the United States Attorneys' Manual § 9–11.150.

The grand jury had begun investigating these civil rights violations on December 7, 1993, and met at least on February 1 and 10, 1994 and May 24, 1994.

### 2. Legal Standards

■ It is well established that juveniles are entitled to the full panoply of fifth amendment rights, including those that apply at investigatory proceedings. *See In re Gault*, 387 U.S. 1, 47–48, 87 S.Ct. 1428, 1454, 18 L.Ed.2d 527 (1967). Indeed, as the Court has noted, "special problems may arise with respect to waiver of the privilege [against self-incrimination] by ... children.... If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Id.*, 387 U.S. at 55, 87 S.Ct. at 1458.

■ If an interrogation is "non-custodial," then the suspect has no right under *Miranda* to have a lawyer present. *See Minnesota v. Murphy*, 465 U.S. 420, 422 n. 3, 104 S.Ct. 1136, 1140 n. 3, 79 L.Ed.2d 409 (1984); *United States v. Lanni*, 951 F.2d 440, 442 (1st Cir.1991) (affirming finding that home interrogation was not custodial under totality of circumstances). Nor does a juvenile have a right, under the statute or the Constitution, to have his parents present. *See U.S. v. M.I.M.*, 932 F.2d 1016, 1018 (1st Cir.1991) (citing with approval the proposition that "a minor may waive the privilege against self-incrimination without parental consent.").

■ What the Fifth Amendment does guarantee, in a non-custodial interrogation of a suspect, is an environment free of coercion. In determining whether a confession was voluntarily given when the suspect is a juvenile, courts uniformly apply a "totality of circumstances" test. *See Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979) (listing factors of age, experience, education, background, intelligence and capacity to understand).

■ Even when, under the appropriate test, a confession is deemed involuntary, the substance of the confession is admissible if there is a subsequent confession without any taint of coercion. "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Oregon v. Elstad*, 470 U.S. 298, 310, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985); *see also United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1475 (11th Cir.1992) (holding that taint of coerced confession was attenuated, where subsequent confession was given), *cert. denied*, —— U.S. ——, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992).

Though the Supreme Court has explicitly held that grand jury witnesses are not constitutionally entitled to "target" or "potential defendant" warnings, *United States v. Washington*, 431 U.S. 181, 186, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977), the U.S. Department of Justice has continued to make warnings for targets a required policy under ordinary circumstances, *United States v. Pacheco–Ortiz*, 889 F.2d 301, 307 (1st Cir.1989) (sanctions appropriate only where conviction was the product of manifestly improper conduct by federal officials). The manual defines a "target" as a "person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." § 9–11.150. A "subject" of an investigation is a person whose conduct is within the scope of the grand jury's investigation. *Id.*

#### i. *SP's Statements*

The government has borne its burden of demonstrating the voluntariness of SP's statements under the totality of the circumstances: SP was not in custody at the time of his interrogation; he was a senior in high school; his parents were present; he had been forewarned of the interview; and he was calm and collected during the interview. In deciding that SP is assertive and self-confident, and that his will was not overborne, the court is particularly influenced by SP's demeanor on the videotape taken after his van was stopped by the police in October, 1993.

#### ii. *WR's Statements*

Under the totality of the circumstances, the case is much closer with respect to WR. On the one hand, WR had no constitutional entitlement to a Miranda warning at the time of the initial interrogation in his home, because the interview was noncustodial. On the other hand, WR was just sixteen years old, a sophomore in high school, and he was alone with an FBI agent and two police officers. While there is no requirement that parents be present, it is troubling that the officers appeared at a time when the parents were likely to be working. A police interrogation in their absence has the potential to be highly intimidating. Moreover, although WR was a suspect as defined in the *United States Attorneys' Manual*, § 9–11.150, and the purpose of the visit was at least in part to subpoena him to the grand jury he was not given the advice of rights which the manual requires to be given to all grand jury witnesses by the prosecutor, not just at the grand jury proceeding but also in advance as part of the subpoena or separate accompanying letter. The delay in informing WR of his status as a grand jury suspect is troubling. However, just the previous year, WR had prior criminal experience in which he was handcuffed, placed in a cruiser and given his Miranda rights. Accordingly, because of his prior involvement in criminal proceedings, the government has met its burden of demonstrating the voluntariness of WR's statements on June 30, 1994.

Moreover, WR consulted with his attorney and his parents during the 5 days that elapsed between his initial interview and the grand jury hearing; and before the grand jury he was properly administered the Miranda rights required by *United States Attorneys' Manual*, § 9–11.50 (Oct. 1, 1990). WR does not in any way challenge the propriety of the grand jury proceedings themselves. Accordingly, even if his initial statement were tainted by failure to give WR his *Miranda* rights as a subject of a grand jury proceeding, defendant's fifth amendment rights were not violated at the grand jury hearing. His testimony was not tainted by any earlier violation. The Court sees no violation of the manual so manifestly improper as to trigger the need for sanctions, particularly as the government has proven guilt beyond a reasonable doubt on both counts without WR's own statements.

### III. Conclusions of Law

#### 1. *Status as Juveniles*

The defendants are charged with acts of juvenile delinquency pursuant to 18 U.S.C. § 5031. The statute provides:

> For the purposes of this chapter, a "juvenile" is a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has attained his twenty-first birthday, and "juvenile delinquency" is the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult.

The defendants were all juveniles at the time of the offenses.

#### 2. *18 U.S.C. § 241*

The Court finds all three defendants are guilty beyond a reasonable doubt on Count 1 of the information.

Count One of the information charges a violation of 18 U.S.C. § 241 for conspiring to injure, oppress, threaten or intimidate Jewish inhabitants of Brockton and Randolph in the free exercise or enjoyment of a right or

privilege secured by the Constitution or laws of the United States. Section 241 of Title 18, United States Code, provides in pertinent part:

If two or more persons conspire to injure, oppress, threaten, or intimidate any inhabitant of any State ... in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; ... [they shall be guilty of a crime against the United States].

Section 241 contains no overt act requirement. *See United States v. Skillman*, 922 F.2d 1370, 1373 n. 2 (9th Cir.1990), *cert. denied*, 502 U.S. 922, 112 S.Ct. 353, 116 L.Ed.2d 275 (1991). The government has proven beyond a reasonable doubt all four elements of § 241:

One: That two or more persons conspired together to accomplish an unlawful purpose.

Two: The purpose of the conspiracy was to injure, oppress, threaten or intimidate one or more persons.

Three: One of the intended victims was an inhabitant of a state.

Four: The conspiracy was directed at the free exercise or enjoyment by such an inhabitant of a right or privilege secured by the Constitution or laws of the United States. *See United States v. McDermott*, 29 F.3d 404, 407–08 (8th Cir.1994).

In order to establish a criminal conspiracy, the government must prove three essential elements:

One: During the time period charged in the information, two or more persons reached an agreement or came to an understanding with the specific intention of injuring, threatening, or intimidating a citizen in the exercise or enjoyment of his rights under the constitution or laws of the United States.

Two: A defendant voluntarily and intentionally joined in the agreement or understanding either at the time it was first reached or at some later time while it was still in effect; and

Three: At the time a defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding. *Id.* at 408 n. 5.

SP, JF and WR knowingly and intentionally entered into an agreement to injure, oppress, threaten and intimidate Jewish inhabitants of Brockton and Randolph in the exercise of rights secured by the Constitution or laws of the United States. They each did this by joining the NDH knowing that one purpose of this group was to run the Jews out of Brockton and Randolph, and sharing that purpose. Defendants openly discussed their hostility against the Jewish people. They agreed upon a plan to damage real and personal property owned by Jews, with the aim of frightening them into leaving the area.

Although overt acts are not required under § 241, each of the defendants engaged in overt acts which manifested their intention of intimidating Jewish residents into leaving. Defendants' use of swastikas and the equally threatening message "All Jews Must Die" on the temple wall at Temple Young Israel is the most persuasive evidence of defendants' intent to intimidate Jews into leaving the area.

The right secured by the laws of the United States, asserted by the government as the basis for Count One, is the right of Jewish persons in Brockton and Randolph to hold property without regard to race, a right protected by 42 U.S.C. § 1982. That statute provides:

All citizens of the United States shall have the same right, in every State and Territory as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

The Supreme Court has made clear that § 1982 protects against private interference with its provisions, *Jones v. Alfred H. Mayer*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968), and that Jewish persons are protected by the statute, *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18, 107 S.Ct. 2019, 2021–22, 95 L.Ed.2d 594 (1985). The right to "hold" property under § 1982 includes the right to "use property." *United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir.1991), *affirmed en banc*, 968 F.2d

433 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1390, 122 L.Ed.2d 764 (1993).

Both temples in Brockton and Randolph are owned by non-profit organizations in which the members hold shares. A limited property interest of this sort is equally protected by § 1982. *See Sullivan v. Little Hunting Park,* 396 U.S. 229, 236–37, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969) (protecting black homeowner's interest in owning membership share in private club). Moreover, Ms. Karp's use of her motor vehicle, personal property, is protected.

The United States has proven that each of the defendants had specific intent to interfere with the federal right of Jewish inhabitants to hold and use property which they purchased as a house of worship, and more generally to hold and use property in the Brockton and Randolph communities.

### 3. *Count Two*

The Court finds all three defendants are guilty beyond a reasonable doubt on Count Two of the Information.

Count Two of the information charges a conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 245.

The defendants are charged with conspiracy to violate federal law under 18 U.S.C. § 371 which provides in relevant part:

"If two more persons conspire .... to commit any offense against the United States .... and one or more of such persons do any act to effect the object of the conspiracy, each [is guilty of an offense against the United States]."

In order to satisfy its burden of proof, the government must establish, beyond a reasonable doubt,

First, that the defendants entered an unlawful agreement to accomplish the unlawful purposes charged in the information.

Second, that each of the defendants knowingly became a member of the conspiracy with the intent to further the common unlawful object of the conspiracy.

Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the information.

Fourth, that the overt acts were committed to further some objective of the conspiracy. *See* 1 L. Sand et al. *Modern Federal Jury Instructions,* ¶ 19.01, Instruction 19–3 (1993). Mere association with members of the conspiracy is not sufficient. *United States v. Cintolo,* 818 F.2d 980, 1003 (1st Cir.1987).

The Information charges that unlawful purpose of the conspiracy was to engage in actions in violation of 18 U.S.C. § 245, which provides:

(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(2) any person because of his race, color, religion or national origin and because he is or has been—

(B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;

(F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public, or of any other establishment which serves the public and (i) which is located within the premises of which is physically located any of the aforesaid establishments; and (ii) which holds itself out as serving patrons of such establishments.

Section 245(b)(2) requires proof of four elements:

One: The defendants must have used force or threat of force.

Two: The defendants must have injured, intimidated, interfered with or attempted to

injure, intimidate or interfere with any person.

Three: The defendants must have acted because of the victims' race or color and because he or she had been enjoying the benefit, service, privilege, facility or activity provided or administered by any subdivision of a State, or because he or she had been enjoying the goods, services, facilities, privileges and accommodations of a place of entertainment and exhibition which serves the public or any other establishment which serves the public and is otherwise covered.

Four: The defendants must have acted willfully.

*See McDermott,* 29 F.3d at 409.

### i. *The Streets of Brockton*

 The government has proven that all three defendants intentionally entered into a conspiracy with the intent to accomplish the unlawful purpose of intimidating black residents from using the streets of Brockton and its places of entertainment. Section 245(b)(2)(B) prohibits racially motivated interference with a person's enjoyment of a facility administered by the state or subdivision thereof. The streets and sidewalks are facilities administered by Brockton, a subdivision of the Commonwealth of Massachusetts, within the meaning of 18 U.S.C. § 245(b)(2)(B). The defendants regularly went out into the streets armed with bricks, bats and other weapons to hunt for black people to assault, with the goal of intimidating Blacks into leaving the Brockton area. The defendants spoke often about driving Blacks out of Brockton. Their belief that there were too many Blacks in Brockton was the motivating factor in their agreement and actions. Indeed, it was this belief that spawned the notion of "bashings." SP and JF assaulted two young black girls because of their race and because they were walking down a sidewalk.

JF has tried to cast doubt on the element of intimidation, for instance, by observing that no residents of Brockton or Randolph, black or Jewish, seem to be packing their bags. There can be no doubt about the defendants' specific intent to intimidate given their preferred techniques and slogans ("Get out of Brockton," "Foreigners Out," "Go back to Africa," etc.). As Judge Aldrich once said, in a section 245 case that arose out of the busing controversy, "The general inculcation of fear in order to further a specific objective is a familiar practice." *See United States v. Griffin,* 525 F.2d 710, 711 (1st Cir.1975), *cert. denied,* 424 U.S. 945, 96 S.Ct. 1414, 47 L.Ed.2d 351 (1976). Indeed here, two Holocaust survivors were intimidated by the Nazi symbols and slogans, and two patrons of the mall expressly told the Lauriat's store owner that they didn't frequent the mall because of skinhead threats.

Although WR had not yet joined the conspiracy at the time the girls were threatened, he did participate in the aborted raid on the Vulcan Bar, a place of entertainment. He was telephoned about the plan in advance and agreed to participate. His participation in the plan included getting bricks for the bashing. While no harm was done, his active participation is sufficient to constitute an overt act, and is more than "mere presence." "Once a conspiracy is established, as well as defendant's intent to further it, any connection between the defendant and the conspiracy, even a slight one, will be sufficient to establish knowing participation." *United States v. Brandon,* 17 F.3d 409, 428 (1st Cir.1994) (citing *United States v. Marsh,* 747 F.2d 7, 13 (1st Cir.1984)). WR's name also appears prominently on a list of NDH members drawn up by Rasnick during the group's period of activity, *see* Gov't Exh. 11.

Even without his own statements to government officers, the government proved beyond a reasonable doubt his membership in the conspiracy by several witnesses at trial. *Contrast United States v. O'Campo,* 964 F.2d 80, 82–83 (1st Cir.1992) (finding insufficient evidence that conspirator's apartment-mate participated in conspiracy, where there was no evidence that defendant attended any meetings with conspirators, and defendant's name did not come up in statements made by any of the conspirators or by the informant). Indeed, he even boasted about participation in the Karp vandalism although the other evidence in this case suggests he was not even a member of the group at the time.

It has thus been established beyond a reasonable doubt that defendants are guilty as charged in Count II under subsection (b)(2)(B) of 18 U.S.C. § 245, covering state facilities.

### ii. *The Mall*

■ The government's argument under section (b)(2)(F), focusing on the Westgate Mall incidents, is more complicated. That section generally covers any "place of exhibition or entertainment which serves the public, or any other establishment which serves the public and (i) which is located within the premises of which is physically located any of the aforesaid establishments; and (ii) which holds itself out as serving patrons of such establishments."

Whether malls are covered by the given provision is not so obvious as it is under the Americans with Disabilities Act, which explicitly lists "shopping center." 42 U.S.C. § 12,181(7)(E). But neither is it so tortuous as under the First Amendment, which has been interpreted to protect free speech in malls only when the private owners' suppression of such speech would be tantamount to "state action." *See, New Jersey Coalition v. J.M.B.*, 138 N.J. 326, 650 A.2d 757, 768–770 (1994) (surveying case law on free speech in malls under federal and state constitutions).

The government fairly constructs its argument around precedents decided in the context of Title II of the Civil Rights Act, 42 U.S.C. § 2000a(b)(4), whence section 245's list of enumerated establishments originated. Section 245 states that a public accommodation includes any establishment "which is physically located within the premises of any establishment otherwise covered by this subsection." In this context, the list of covered establishments has traditionally been construed broadly, to animate the statutory purpose of protecting civil rights. *See Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1269 (7th Cir.1993) (citing *Daniel v. Paul*, 395 U.S. 298, 308, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318 (1969) as mandating a broad reading of the statute), *cert. denied*, — U.S. —, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993).

The Westgate Mall—including its garage—is covered by subsection (b)(2)(F) for two independent reasons. First, it holds itself out as serving the patrons of all the stores it contains; and it contains eight restaurants, those being covered facilities under the plain language of the statute. *See Daniel*, 395 U.S. at 305, 89 S.Ct. at 1701 (holding that snack bar's status as a covered establishment automatically brings the entire surrounding country club facility within the ambit of Title II). Second, it sponsors entertainment events, and "any establishment which presents a performance for the amusement of a viewing public" is covered. *See Miller v. Amusement Enterprises, Inc.*, 394 F.2d 342, 348 (5th Cir.1968) (en banc) (holding that amusement park was covered because, among other reasons, parents are "people watchers", and go to the park to watch their kids "perform" in kiddie rides and ice skating rinks).

Similarly, because the mall is a covered facility by virtue of its presentation of performances, Lauriat's Bookstore is covered because it holds itself out as serving the patrons of the mall, and is located within the premises of the mall.

■ The government has proven that all three defendants planned to intimidate black patrons from using the mall's facilities and took actions to accomplish that goal. While only SP directly participated in the threatening conduct at Lauriat's, Brian Clayton's violent threat to the black couple was an act conducted during and in furtherance of the conspiracy and was intended to intimidate African–Americans from using the mall. Because all three were members at the time of the incident, and it was reasonably foreseeable to both JF and WR, this overt act is attributable to them.

### *ORDER*

For the foregoing reasons, the Court finds the juvenile defendants SP, JF and WR guilty beyond a reasonable doubt as charged in Counts I and II of the information.